THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN C. NEAL, Defendant-Appellant.

Second District   No. 82—335

Opinion filed February 22, 1983.

Rolfe F. Ehrmann, of Dixon, Morin, Ehrmann & Gehlbach, of Dixon, for appellant.

Eugene Stockton, State's Attorney, of Dixon (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE VAN DEUSEN delivered the opinion of the court:

Defendant appeals his conviction for the murder of his wife. His sole contention on appeal is that the trial court committed reversible error in refusing to give his tendered instructions on voluntary manslaughter. The facts necessary to a determination of this question are as follows.

In August 1980 defendant and his wife, Karren, were married. It was a second marriage for both, and each had two children from the prior marriage. Defendant's children lived with his former wife, from

whom he had obtained a bitter divorce in fall 1979, and Karren's 19-year-old daughter Kandy had lived with them when they were first married but was not living with them at the time of the offense. Defendant testified that he had experienced child-visitation problems, which were alleviated about six months prior to the shooting.

Defendant testified at trial that on July 29, 1981, he had some problems at work and decided that he would see the regional vice-president about the transfer that he had requested several months earlier. He discussed the events of the day and the possibility of a transfer with Karren over dinner, and, as in prior discussions on this topic, Karren was negative about it. After dinner, Kandy called about her car battery problems, with which she had had defendant come out and help her earlier in the day.

That evening, Kandy and her boyfriend came over and visited. While defendant and Kandy's boyfriend were out to get some beer, Karren suggested that her daughter move back with them but Kandy refused for the time being. Karren did not say anything that evening about moving but had mentioned it on other occasions. Kandy and her boyfriend left at about 10:30 p.m.

Thereafter, an argument ensued between defendant and Karren. The argument began about the number of checks written; then, they argued about defendant spending the money on drinking, which he first denied and then said he had been drinking more than he should have because of his pain (due to headaches resulting from two laminectomies and a sinus condition). The bulk of the argument concerned the job transfer and Karren's purchase of items for the house from her place of employment. She said she would quit buying those things but she did not want to move. She suggested that he get a job with a different company to stay in the area and that they live off of her income, including payment of his child-support obligations.

Shortly thereafter, defendant decided the argument was not accomplishing anything and that he would leave. He got out two keepsakes, a cup and a shotgun, to take with him. At one point thereafter, defendant said he was leaving, Karren responded that he was always leaving, and the argument continued. At some time, Karren went to bed and defendant began to shave. He looked in the mirror and became "totally disgusted with [himself] and the day and everything else." He went into the bedroom and "thundered" at Karren about the car battery, thus beginning the argument anew. At that point, Karren got out of bed and went into the living room.

She told defendant that he treated her worse than her former husband ever did. She claimed that "you don't love a woman like a

woman loves" or "part of you nobody will ever have or own," and John responded, "there's a part of me nobody will ever own *** no corporation, no woman, or child." In anger Karren asked if he had treated his former wife the same way, and she then declared, "I'm going to call her and see if you treated her this way." John protested that his former wife should not be bothered. When Karren proceeded to the kitchen phone, John offered her his wedding band, which she refused, and she picked up the phone.

John then went into the bedroom to get traveler's checks, his wallet, keys and change. Those items were on a chest of drawers next to two shotgun shells. He put the other items in his back pocket and took one shell, returned to the living room, picked up the shotgun instead of leaving, apparently loaded it, went around the corner to the kitchen doorway and shot from the hip, striking Karren in the chest as she sat on a chair next to the wall phone.

In his statement to police following the shooting, John said that, at the time he fired the weapon, he told Karren, "make your peace." In any event, Karren never responded before being killed. Apparently, he then unloaded the gun and called an ambulance, stating, "I shot my wife" and "I'm going to try to keep her alive until you get here." He then laid her flat on the floor, and the responding firemen observed him over Karren's body apparently administering C.P.R.

Both before and after receiving *Miranda* warnings, defendant kept repeating that he had shot his wife, and he told police officers that he was sorry he had done it. A tape-recorded confession was taken at the police station on the night of the offense and played to the jury at trial. At the close of all of the evidence, the defense tendered jury instructions and verdict forms on voluntary manslaughter, but the trial court refused them and instructed the jury only on the charge of murder. Defendant was found guilty as charged.

■ Jury instructions on voluntary manslaughter are not always proper in every case in which some provocative conduct on the part of the deceased prior to the killing is alleged. In determining whether such instructions should be given over objection, as in the case at bar, the trial court must decide if enough evidence of serious provocation had been presented to even put the issue to the jury. In Illinois, the initial burden of going forward with "some evidence" is upon the defendant who seeks to assert the voluntary manslaughter defense, and, where the circumstances fail to show even "some evidence" of serious provocation, voluntary manslaughter instructions are properly denied. (*People v. Seaberry* (1978), 63 Ill. App. 3d 718, 721-22.) In order to require the giving of the tendered instructions, defendant's vol-

untary manslaughter theory of defense to the murder charge may have a very tenuous evidentiary foundation, but it must be of such a nature that, if believed by the jury, it would reduce the crime of murder to voluntary manslaughter. See *People v. Dortch* (1974), 20 Ill. App. 3d 911, 914.

In this case, defendant argues that the evidence of his four-hour argument with the victim, which he characterizes as a marital breakup, and of the victim's statement of intent or actual attempt to telephone defendant's ex-wife at 2:50 a.m., which would injure defendant by embarrassing, humiliating and degrading him before his ex-wife and by exacerbating his child-visitation problems, sufficiently showed provocation to warrant the giving of the instructions.

■ The State and defendant agree that, as a general rule, mere words are not sufficient provocation to establish voluntary manslaughter. (*E.g., People v. Simpson* (1978), 74 Ill. 2d 497, 502; *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 1040.) This is true of language however aggravated, abusive, opprobrious or indecent. (*People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, citing *People v. Marrow* (1949), 403 Ill. 69, 75.) On appeal, as in the trial court, defendant seeks to avoid the application of this rule by characterizing the facts of the instant case as a heated verbal exchange that reached the level of mutual quarrel or combat. It is well established that mutual quarrel or combat can be sufficient to support a finding of serious provocation. *E.g., People v. Crews* (1967), 38 Ill. 2d 331, 335; *People v. Wesley* (1978), 65 Ill. App. 3d 25, 30; *People v. Matthews* (1974), 21 Ill. App. 3d 249, 253.

There was no mutual combat here. Mutual combat is a fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from the combat. *People v. Matthews* (1974), 21 Ill. App. 3d 249, 253.

Even if we were to agree that the argument between the defendant and his wife could be characterized as a mutual quarrel, the critical question remains whether her conduct as a participant in the mutual quarrel reached the level of serious provocation that is required to reduce the killing to manslaughter. (*People v. Robles* (1975), 30 Ill. App. 3d 335, 336-37; *People v. Tucker* (1971), 3 Ill. App. 3d 152, 155.) The conduct must be sufficient to excite an intense passion in a reasonable person. (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(a).) The test is objective, not subjective. The inquiry is not as to whether this defendant was angry at someone or about something at the time he shot and killed the deceased. The question to be asked is whether there existed

such provocation on the part of the decedent as would have caused the state of mind claimed in an ordinary person under the same circumstances. The provocation must be proportionate to the manner in which the accused retaliated, and the crime is murder when the accused attacked the deceased with violence out of all proportion to the provocation especially where, as here, the homicide was committed with a deadly weapon. *People v. Matthews* (1974), 21 Ill. App. 3d 249, 252-53.

Defendant cites several cases where a homicide followed a quarrel and the evidence was or was not sufficient to justify a voluntary manslaughter instruction, and he cites several other such cases where the voluntary manslaughter issue went to the trier of fact and the evidence was or was not sufficient to sustain the finding of the trier of fact on the issue of the sufficiency of the conduct as serious provocation. While some of these cases more closely approximate the circumstances here than others do, none are on all fours with the facts of the instant case, and a number of these cases have additional elements, *e.g.,* threatened or actual physical attack on defendant, his family, or property, not present here. *People v. Griswold* (1950), 405 Ill. 533 (giving manslaughter instructions was warranted by the evidence where decedent had, on the night of the shooting, as she had on several other nights, stayed out all night, and a heated quarrel arose on the subject and upon her failure to answer defendant's repeated inquiries as to her whereabouts); *People v. Stepheny* (1966), 76 Ill. App. 2d 131 (facts that decedent and defendant exchanged harsh words in a quarrel of some duration over the betting in a crap game and that decedent was shot when he offered to make a bet with defendant after defendant warned him not to try to bet with him again formed a basis for the provocation necessary to reduce the charge to voluntary manslaughter); *People v. Rice* (1933), 351 Ill. 604, and *People v. Robles* (1975), 30 Ill. App. 3d 335 (evidence of sufficient provocation to reduce the charge to voluntary manslaughter existed where an argument was caused by decedent's conduct involving defendant's child); *People v. Tucker* (1971), 3 Ill. App. 3d 152 (where decedent kept argument going, defendant tried to retreat, and decedent followed him, beat on his car windows and bent the car's antenna prior to the shooting, there was evidence of sufficient provocation to reduce the charge to voluntary manslaughter).

Defendant also gives many reasons for his preexisting frame of mind other than the actions by the deceased and cites several cases where this element was significant. *People v. Newberry* (1970), 127 Ill. App. 2d 322 (where the defendant was already in a depressed emo-

tional state, told decedent that he would commit suicide one day, and decedent replied in an obscene manner, telling him that she did not care what he did, the court found that her attitude and the nature of her reply sufficiently aroused and impassioned the defendant considering his preexisting emotional state); *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 1041-42 (the cumulative effect, over a five-day period, of defendant's wife's absence, his fruitless searching for her whereabouts, her retention of counsel for the purpose of obtaining a divorce, and her slurring remarks as to his masculinity and announcement that she had found another man created a state of provocation so that the defendant killed her in a "frenzied state of passion").

In the present case, defendant testified, both he and his wife had had a bad day at work; he had experienced a difficult divorce, continuing problems with his ex-wife and child-visitation problems alleviated some six months prior; and he and his wife had argued several times before about her buying things for the house and her reluctance to move with him to a transfer in job location. However, some of these events are too remote to the time of the shooting to be supportive of defendant's claim (see *People v. Collins* (1976), 43 Ill. App. 3d 553, 555) and, aside from defendant's statement that he never felt like that before, the record does not support his claim on appeal of uncontrolled rage and frenzy arising from this combination of circumstances. Compare *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038.

In summary, the evidence in this case showed that defendant initiated the quarrel, and he kept it going after the deceased retreated from it; there was no indication of physical harm or threat thereof; defendant threatened to end the marital relationship, which the victim refused; defendant went to the bedroom for the shell, returned to the dining room, loaded the shotgun and then fired at his wife in the kitchen (see *People v. Miller* (1981), 96 Ill. App. 3d 212, 215 (defendant's actions in removing the shotgun from his car trunk, loading it and cocking it bespeak deliberation and malice indicative of the *mens rea* necessary for a murder conviction)); and defendant appeared to other witnesses after the act to be calm and cooperative and he had good recall of the evening's events, strongly contrary to his claim of frenzied passion (compare *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 1041).

Passion on the part of the slayer, no matter how violent will not relieve him from liability for murder unless it is engendered by a serious provocation which the law recognizes as being reasonably adequate. If the provocation is inadequate, the crime is murder. *People v. Matthews* (1974), 21 Ill. App. 3d 246, 253.

■ While the doctrine of provocation is intended to be a compassionate one, based upon a recognition of human frailty (*People v. Crews* (1967), 38 Ill. 2d 331, 336), it is not without limits. While very slight evidence on a voluntary manslaughter theory of defense to a murder charge will justify the giving of an appropriate instruction (*People v. Dortch* (1974), 20 Ill. App. 3d 911, 914), that evidence must demonstrate more than slight provocation. Where the record fails to present evidence of serious provocation sufficient to excite a reasonable man to intense passion, the instruction is properly refused. (*People v. Simpson* (1978), 74 Ill. 2d 497.) From our review of all the evidence in this case considered in the light most favorable to the defendant, we conclude that the conduct of the victim concerning her quarrel with the defendant, including her conduct with regard to the phone call, was, as a matter of law, insufficient to constitute the serious provocation necessary to reduce the defendant's murder of his wife to voluntary manslaughter. The trial court did not err in refusing the voluntary manslaughter instruction tendered by defendant.

The judgment and sentence of the trial court is affirmed.

Affirmed.

HOPF and UNVERZAGT, JJ., concur.