THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELTON HOUSTON *et al.*, Defendants-Appellants.

First District (2nd Division) No. 84—2732

Opinion filed December 23, 1986.—Rehearing denied February 3, 1987.

Thomas Peters, of Chicago, for appellant Elton Houston.

Charles G. Murphy, of Chicago, for appellant Robert Brown.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Rimas F. Cernius, and James E. Tyrrell, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Elton Houston appeals his conviction for murder by a jury, and Robert Brown appeals his conviction for murder by the court in a simultaneous trial before the same trial judge. Both were sentenced to 35 years' imprisonment. They jointly identify issues on appeal to include whether the circuit court erred in: (1) finding the police had probable cause to arrest each defendant, and (2) finding each defendant was proved guilty beyond a reasonable doubt. Additionally, Houston claims that the circuit court erred in: (1) failing to suppress statements he made to police in his apartment before he received *Miranda* warnings, and (2) refusing to permit cross-examination of a police officer to elicit a statement made by Houston to that officer at the police station after the State elicited earlier conversations between Houston and the officer. Brown asserts further error in questioning whether: (1) his jury waiver was invalid because premised on a reasonable but mistaken belief that the only occurrence witness would explain his having recanted his statements because of gang intimidation, and (2) the circuit court erred in failing to grant him a new trial based on newly discovered evidence that two other men confessed to the murder and exonerated Brown.

At about 7:20 p.m. on June 18, 1983, Ronnie Bell was struck and killed by 15 gunshots fired by two or three assailants at 315 West 88th Street in Chicago.

Earlier that evening, at 6 p.m., Larry Baker noticed a brown and white Buick parked in his usual space in front of his home at 451 West 87th Street. Baker pulled alongside, looked in the car, then parked directly ahead of the Buick. As he unloaded his car, Baker again glanced at the Buick and then took another look as he walked between the two cars. Baker noticed three people in the car, two in front, one in back. He could not get a good look at the driver but testified that the front-seat passenger was a black male with a medium afro, half beard, and a mustache, age 24 to 25. Baker described the back seat passenger as a black male, age 19 to 24, with his hair in corn curls, having sideburns and a mustache. The car drove off before 6:10 p.m.

Baker again saw the same car, with three occupants, at 7:30 p.m. when it pulled up near his home. All three men exited the car. One man appeared to adjust a burglar alarm or lock the car; then all three

left in another car. Later that evening Baker described the front-seat passenger to Officer James Gorman as a black male, age 19 to 24, with a medium mustache, full afro, sideburns, and an earring in his right ear, about 5 feet 9 inches to 5 feet 11 inches in height.

Charles Anderson, driving west on 88th Street, saw his friend Ronnie Bell at 7 p.m. walking east on 88th near Harvard. He stopped, and they talked. Anderson noticed a brown Buick in front of him, with three occupants. As they talked, Anderson saw two men leave the car, wearing gloves, although it was a warm day, and walk towards him and Bell. As they walked quickly past him, one man looked right at Anderson, who looked back. Anderson drove off west, while Bell continued walking east. When the police interviewed Anderson the next day, he described one man as a black male, 30 years old and 6 feet tall and the other as a black male wearing dark clothing, stocky, with facial hair and medium dark skin.

Verdist Poindexter, who lived at 88th and Harvard, heard gunshots at about 7:15 p.m. or 7:20 p.m. while watching television. He crawled on the floor to a corner window and saw a man run up to Ronnie Bell and start shooting. Poindexter watched the man fire five more shots at Bell and heard another shout: "Come on. Let's go." Poindexter saw the shooter run back to a brown and white Buick stopped in the middle of the street, which was driven off. It was bright daylight and he saw the shooter's face during the shooting and again when the gunman ran past him to reach the Buick. Poindexter estimated the gunman was only about 15 to 20 feet away from him.

When the police arrived a few minutes later, Poindexter described the gunman to Officer Charles Williams as a black male wearing a green shirt and blue jeans, about 23 years old with straight permed hair. He later denied he had mentioned straight permed hair and thought he told the officer the man was wearing a cap or a hat. Officer Williams reported Poindexter was visibly shaken when they talked. Later, when calmer, Poindexter described the shooter to another police officer as a black male in his twenties with a dark complexion, wearing a green shirt and blue jeans and guessed the gunman's height at 5 feet 9 inches.

After the police interviewed Poindexter, they began searching for the Buick. Officer Marshall Massey discovered a car fitting the description at 451 West 87th Street. The engine was still warm. Massey interviewed Baker, secured the car, and had Poindexter identify it. When evidence technicians checked the car, they found a weight lifter's belt inscribed "OFF. AKULA (EL)." Akula El was the nickname of J. L. Houston, the car's registered owner. The car had not been

tampered with.

Evidence technicians also found two automatic pistols without bullets under the front seat of the car and a third pistol inside a tan bag in the car. A police firearms expert later testified that 14, .45-caliber bullets found in Bell's body were fired from the two pistols found under the front seat. The only identified fingerprints found were one set belonging to J. L. Houston.

Four police officers went to J. L. Houston's address, 168 North Latrobe, Chicago. His mother informed them that J.L.'s brother Elton had driven the car and telephoned Elton. Officer Joseph Danzl spoke with him, and, at Elton's invitation, the police went to Elton's apartment at 5247 West Lake Street.

Elton Houston claimed he had last seen the car the previous evening at 11 p.m., discovered it missing about 10 a.m. that morning, and thought J.L. had taken it. That night J.L. called him stating he did not have the car. Elton telephoned the police to report the automobile stolen. Police records indicate the stolen-car report was made at 11:02 p.m. Police requested that Elton accompany them to the station for further questions and gave him *Miranda* warnings after he arrived at the station.

Meanwhile, when police earlier talked with Baker near the Buick, he pointed to a man, later identified as Louis Lomax, whose hair resembled one of the occupants of the car. The police took Lomax into custody. The next day Lomax told Detective Larry Nitsche that he worked as a carpenter for the El Rukns and, while visiting his girlfriend's apartment at 6400 South Woodlawn, someone asked him to find out what the police knew about the brown Buick and the homicide. On June 19 after 3 p.m., Detective Nitsche went to 6400 South Woodlawn to question Lomax's girlfriend. While talking to her, he heard a noise at the door, pulled it open suddenly, and defendant Robert Brown fell into the room through the doorway, wearing a doctor's stethoscope on his head. Brown identified himself as an El Rukn, told the detective to get out, and refused to explain what he was doing at the door. Noticing Brown was wearing blue jeans and a green army fatigue shirt, which matched the color of one of the reported assailants, Nitsche took Brown to the police station.

On June 19, Poindexter identified Brown in a lineup as the man who had shot Ronnie Bell. That same night, both Anderson and Baker identified Elton Houston in a lineup as an occupant of the brown Buick, both pointing out that Houston had an afro when they saw him on June 18 but wore his hair in braids at the time of the lineup. Baker was unable to identify Lomax in a lineup.

Houston and Brown were indicted for murder and armed violence in July 1983. Elton Houston was tried by a jury, which Brown waived. Their joint attorney, Thomas Peters, noted that his cross-examination of Poindexter might allow the State to raise the question of Brown's alleged El Rukn membership. Peters asserted that Poindexter had recanted his testimony in a telephone conversation with Peters, claiming he did not see the shooting and was drunk during the lineup. The circuit court found Brown guilty of murder on April 24, 1984, and sentenced him to 35 years' imprisonment on July 31, 1984. The jury deadlocked, and the Houston trial ended in a mistrial on April 23, 1984. A second jury convicted Houston of murder on August 9, 1984, and he was sentenced to 35 years in prison on October 9, 1984. Defendants appeal.

I

Defendants contend the police lacked probable cause to arrest them since they did not own or possess the Buick nor did they fit the descriptions of the alleged offenders. Houston additionally alleges that evidence of gang affiliation was improperly considered by the court.

■ The State must prove that a warrantless arrest is based on probable cause (*People v. Strauser* (1986), 146 Ill. App. 3d 128, 133, 496 N.E.2d 1131) which exists when the arresting officer's knowledge would lead a reasonably prudent person to believe a suspect has committed a crime (*People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475). Probabilities are analyzed based on factual and practical considerations, not on technicalities. (*People v. Wright* (1986), 111 Ill. 2d 128, 146, 490 N.E.2d 640.) Probable cause depends on the totality of facts and circumstances known by the arresting officers. (*People v. Strauser* (1986), 146 Ill. App. 3d 128, 133, 496 N.E.2d 1131.) A "mere suspicion" that an individual has committed a crime is insufficient; however, evidence sufficient to convict is not necessary. *People v. Reynolds* (1983), 94 Ill. 2d 160, 166, 445 N.E.2d 766; *People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92; *People v. Strauser* (1981), 146 Ill. App. 3d 128, 133, 496 N.E.2d 1131.

■ In the case *sub judice*, the circuit court found that Houston was arrested at his apartment when the police requested Houston accompany them to the station. In finding probable cause for Houston's arrest, the court considered that: the police knew the Buick was involved in the murder; Mrs. Houston had informed them that Elton knew about the car; the police believed the El Rukn gang was involved (based on finding the engraved belt in the car); and also they

knew Elton was an El Rukn. The record reveals, however, that Elton claimed to have seen the car last on the night before the incident. There was no evidence that he was in possession of the car at or near the time of the shooting. His mother's assertion that Elton "had driven" the car did not contradict Elton's version nor place him in the car at a time prior to or after the shooting. Further, the arresting officers did not know that Elton Houston was an El Rukn before they arrested him. The physical description of Elton given by witnesses at that time also was uncertain. The closest description then possessed by police was that given by Baker; however, his hair was not braided, he had no beard, and had no mustache. Although Detective James Gorman claimed he was told that Houston's hair was being rolled when police entered the apartment, none of the officers who were there so testified. Further, neither his described height nor age was sufficiently particularized to support probable cause for his arrest. Accordingly, based on the totality of facts and circumstances, probable cause to arrest Houston was absent in this case. The circuit court's finding to the contrary was manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766; *People v. Strauser* (1986), 146 Ill. App. 3d 128, 134, 496 N.E.2d 1131.

Similarly, the police had no reasonable grounds to believe that Brown had committed a crime. The only particularized physical description of Brown was given by Poindexter. He was said to have first described Brown as having been 5 feet 9 inches tall with straight, permed hair. Brown was 6 feet 2 inches tall and had a natural-hair arrangement. Poindexter later denied having given this hair description, claiming to have said that Brown was wearing a hat or cap. Detective Nitsche knew Louis Lomax was an El Rukn employee. He was trying to learn who sent Lomax to check on the police investigation. Brown was found listening at the door with a stethoscope on his head, and he admitted being an El Rukn. Also, he tried to interfere with Nitsche's investigation. Brown's clothes resembled those worn by the shooter; however, Brown was not taken into custody until around 3 p.m. the day after the murder. His alleged connection with the crime otherwise may be said to have been sufficient to raise a suspicion of his involvement, but did not rise to probable cause for his arrest. The finding of probable cause for Brown's arrest therefore was also manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766; *People v. Strauser* (1986), 146 Ill. App. 3d 128, 134, 496 N.E.2d 1131.) We nevertheless affirm for reasons which follow.

II

Both defendants contend they were not proved guilty beyond a reasonable doubt considering the alibi testimony presented by Houston's witnesses and the contradictions in the testimony given by the single witness who identified Brown.

■■ ■ Assessments of witness credibility are particularly significant where, as here, conflicting evidence is presented. (*People v. Kline* (1982), 92 Ill. 2d 490, 505, 442 N.E.2d 154.) A determination of guilt by the trier of fact will not be set aside unless the proof is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt. (92 Ill. 2d 490, 506, 442 N.E.2d 154.) The testimony of a single, credible witness can be sufficient to support a conviction if the witness observed the accused under conditions permitting a positive identification. (*People v. McNutt* (1986), 146 Ill. App. 3d 357, 365, 496 N.E.2d 1089. See *People v. Molstad* (1984), 101 Ill. 2d 128, 133, 461 N.E.2d 398.) The trier of fact is not required to believe alibi testimony contradicting a positive identification of an accused, though such testimony is presented by a greater number of witnesses. *People v. Catlett* (1971), 48 Ill. 2d 56, 64, 268 N.E.2d 378; *People v. Baker* (1979), 78 Ill. App. 3d 411, 417, 396 N.E.2d 1174.

Family members and friends of Houston testified that he was with them the evening of June 18, 1983, first at his mother's home on the west side, then at Bob's Grocery Store, whose owner was arrested at 8:43 p.m. Four of Houston's sisters recalled seeing him at his mother's house; two of them saw him there as late as 7:45 or 8 p.m. Pete Weaver testified he talked with his friend, Houston, about 30 to 45 minutes on the front porch, beginning around 6:15 or 6:20 p.m. Weaver stated Houston had an afro hairstyle at that time. Weaver also testified he had been at the store with Houston for 30 to 45 minutes before the arrest. Eddie Crout, one of Houston's sisters' schoolmates, testified that he saw Houston outside the grocery store at approximately 7:40 p.m. These witnesses contradict each other since Houston could not have been at the store at 7:40 or 8 p.m. if he was still at his mother's home until 7:45 or 8 p.m. Crout identified Houston from a photograph he stated he first saw on August 6, 1984. Further, Officer Michael Nelson saw Crout at the store, but neither Houston nor Weaver.

The alibi testimony also directly conflicted with the identifications of Houston by witnesses Baker and Anderson. Baker saw Houston in the Buick on the south side about 6 p.m. and again leaving the car at 7:30 p.m. Anderson saw Houston walk towards him after 7 p.m. on 88th Street. Both Baker and Anderson had ample opportunity to iden-

tify Houston in bright daylight on a June evening. Both witnesses made positive identifications at lineups and at trial. Both stated Houston wore his hair in an afro that evening, which Weaver, one of Houston's alibi witnesses, confirmed. The testimony of Baker and Anderson agree on salient points. (*People v. Hudson* (1981), 102 Ill. App. 3d 346, 349, 430 N.E.2d 51.) The jury found Baker and Anderson credible.

Brown presented no alibi testimony. Stipulations between the defense and the State indicate that Brown gave inconsistent accounts of his activities, informing Detective Joanne Ryan he did carpentry work from 7:30 to 8:30 p.m. at 75th and Kingston and telling Assistant State's Attorney Steve Ruecker he stopped his carpentry work at 7:15 p.m. and went to his home at 64th and Woodlawn where he remained until 11 p.m. with his girlfriend. Instead, Brown contends the credibility of the only witness against him, Poindexter, is impaired by contradictory statements.

Poindexter denied stating the shooter had straight permed hair, as Officer Williams testified Poindexter had so described him, but said he was wearing a hat or cap at that time. Also, Poindexter testified that through the windows of his home, he saw Brown shoot Bell, but he reportedly told Williams he stepped outside his house when he heard the first shots fired. Poindexter claimed he went outside after the assailants drove off. Further, although Poindexter's explanation that he recanted his testimony while speaking to Brown's attorney because of 10 to 15 harassing telephone calls from the latter was contradicted by the attorney, the latter did admit having made 5 calls to Poindexter or his family. Finally, the State earlier asserted that Poindexter would explain his recantation by reason of his fear of El Rukns; however, Poindexter testified that fear of the gang caused him to go to Missouri several times, but he recanted due to defense counsel's telephone calls. Poindexter also stated he received telephone calls from someone named Jeff.

■ The circuit court found Poindexter's testimony had been impeached, but not as to its material points. Poindexter made an immediate, positive identification of the automobile. He observed the gunman under conditions permitting a positive identification. He testified that Brown had to run past him to reach the Buick when he saw Brown's face. Poindexter had ample opportunity for observation. (*People v. Childs* (1981), 95 Ill. App. 3d 606, 617, 420 N.E.2d 513.) Failure to correctly describe all physical characteristics does not destroy the credibility of a witness. (*People v. Catlett* (1971), 48 Ill. 2d 56, 63, 268 N.E.2d 378.) See the catalogue of physical description dis-

crepancies in *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 616-17, 378 N.E.2d 1318.

The circuit court found Poindexter's testimony substantially credible; the discrepancies complained of do not make that finding erroneous.

■ In this connection, it must be noted that both Baker and Anderson made in-court identifications of Elton Houston as one of the men involved in the murder, as did Poindexter of Brown. The evidence reveals independent bases for those in-court identifications which could properly have been considered by the jury and court in concluding that Houston and Brown were guilty of murder. In *United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244, the Supreme Court held that in-court identifications need not be suppressed when based upon the independent recollections of an offender aside from an unlawful arrest. 445 U.S. 463, 473, 63 L. Ed. 2d 537, 547, 100 S. Ct. 1244, 1251; see also *People v. Payne* (1983), 98 Ill. 2d 45, 52, 456 N.E.2d 44; *People v. Agee* (1981), 100 Ill. App. 3d 878, 882, 427 N.E.2d 244; *People v. Dangerfield* (1979), 78 Ill. App. 3d 1046, 1050, 398 N.E.2d 57; *People v. Hornal* (1975), 29 Ill. App. 3d 308, 318, 330 N.E.2d 225.

■ Factors to be considered in ascertaining whether there is an independent origin for an in-court identification set forth in *United States v. Crews* (1980), 445 U.S. 463, 473 n.18, 63 L. Ed. 2d 537, 547 n.18, 100 S. Ct. 1244, 1251 n.18, citing *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, include: (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention at that time; (3) the existence of any discrepancy between pretrial descriptions and a defendant's actual appearance; (4) the lapse of time between the crime and the confrontation; (5) any identification of another person prior to the lineup; and (6) the failure to identify the defendant on a prior occasion. The evidence in this case demonstrates that under the *Crews* standards, the in-court identifications by Baker, Anderson, and Poindexter were not the result of exploiting the illegal arrests but were based upon circumstances entirely independent of the arrests so as to be purged of any taint resulting therefrom.

Under the foregoing evidence, we cannot say that either Houston's or Brown's conviction was based on unreasonable, improbable, or unsatisfactory proof.

## III

■ Houston next maintains that evidence of his conversation

with police in his apartment should have been suppressed because the police failed to first give him *Miranda* warnings. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

Police may question citizens while conducting investigations. (*People v. Skozen* (1986), 142 Ill. App. 3d 515, 525, 491 N.E.2d 1352.) Such investigative inquiries may be made without *Miranda* warnings when officers confront suspicious circumstances which may be resolved by adequate explanations. (*People v. Jones* (1981), 97 Ill. App. 3d 619, 625, 423 N.E.2d 235.) In the case at bar, the police were tracking down the brown Buick and requested explanations of Houston to ascertain who last had control of the automobile. The circuit court correctly found Houston was not in custody until after the police questioned him in his apartment. The police asked proper investigative questions; no *Miranda* warnings were required until Houston was arrested.

## IV

■ Police questioning of Houston at the apartment was placed in evidence. The circuit court limited defense cross-examination concerning a statement later made by Houston at police headquarters asserting his presence at a grocery store that evening when police arrested its owner. Houston asserts this was part of an ongoing conversation already partially elicited by the State and the circuit court erred in denying cross-examination as to the "complete" conversation.

An in-custody statement made by a defendant after his arrest offered in his favor is not an admission and is properly excluded by the circuit court as hearsay. (*People v. Visnack* (1985), 135 Ill. App. 3d 113, 127, 481 N.E.2d 744.) Additional portions of a statement or conversation should be admitted if their omission would mislead the trier of fact. *People v. Olinger* (1986), 112 Ill. 2d 324, 337, 493 N.E.2d 579; see *People v. Weaver* (1982), 92 Ill. 2d 545, 556-57, 442 N.E.2d 255; *People v. Williams* (1986), 146 Ill. App. 3d 767, 770, 497 N.E.2d 377.

■ At bar, the State presented evidence relating to the conversation between Houston and Detective Danzl at Houston's apartment, but did not offer into evidence any conversation at the police station between them. Assuming, *arguendo*, that the alibi assertion by Houston at the police station had some bearing on Houston's earlier statements concerning possession of the automobile (*People v. Olinger* (1986), 112 Ill. 2d 324, 338, 493 N.E.2d 579), the alibi was placed before the jury through the testimony of defense witnesses Pete Weaver and Eddie Crout. We find no reversible error.

## V

██ Brown contends that his jury waiver was invalid because it was premised on a belief that Poindexter would claim El Rukn intimidation as having caused Poindexter's recantation and such evidence of gang affiliation would prejudice a jury. At the time of the waiver, Brown's attorney stated that the prejudicial possibility of Brown's El Rukn affiliation being developed by cross-examination of Poindexter caused the jury waiver. The prosecutor had previously stated the explanation for the recantation would be that Poindexter "felt intimidated by, not so much Mr. Peters, but by the El Rukns in general, not Mr. Peters." Brown relies on *People v. Norris* (1978), 62 Ill. App. 3d 228, 231-33, 379 N.E.2d 80, in which a jury waiver, made without knowledge of two eyewitnesses, was invalidated because defendant had expected only a circumstantial case to be presented. *People v. Norris* (1978), 62 Ill. App. 3d 228, 232-33, 379 N.E.2d 80.

A jury waiver made in a defendant's presence by his attorney binds him unless some prejudice to defendant is proved. (*People v. Akis* (1976), 63 Ill. 2d 296, 300, 347 N.E.2d 733.) Whether a waiver is knowingly and understandingly made depends on the facts and circumstances of each case. *People v. Spain* (1980), 91 Ill. App. 3d 900, 906, 415 N.E.2d 456.

Here, defense counsel emphasized that he feared evidence of Brown's El Rukn affiliation might prejudice a jury. Such evidence had already been ruled proper if admissible, however, when a defense motion *in limine* to prevent evidence of gang affiliation was overruled. Brown had admitted to police that he was an employee of the El Rukns; he could reasonably anticipate that evidence linking him to the El Rukns would probably be presented. Accordingly, Brown was not prejudiced by his jury waiver.

## VI

 Brown's final contention is that the circuit court erred in denying his motion for a new trial based on newly discovered evidence in which two men confessed to the murder and exonerated Brown. An affidavit of Evelyn Mapp, mother of Brown's children, dated July 10, 1984, asserts that two days after Brown was found guilty, Earl Hawkins told her he knew Brown had not killed Bell because Hawkins and two other men were responsible. An affidavit of Darrell Cannon, a prisoner at Joliet, notarized July 30, 1984, states that around June 18, 1983, J. L. Houston came to Cannon's house, admitted he had participated in a shooting, and identified two others with him during the shooting, neither being Brown nor Elton Hous-

ton. Cannon further asserted J.L. used the telephone ostensibly to contact J.L.'s brother and he heard J.L. tell the recipient to report J.L.'s car stolen. Cannon checked J.L. into a motel under Cannon's name. He remembered J.L. asking whether there had been reprisals against El Rukns because of the shooting.

To warrant a new trial, newly discovered evidence must be material, so conclusive it will probably change the result, discovered after the trial, and incapable of being discovered prior to trial by the exercise of due diligence. (*People v. Molstad* (1984), 101 Ill. 2d 128, 134, 461 N.E.2d 398.) Declarations against penal interest may be admitted as an exception to the hearsay rule if there are objective indicia of trustworthiness that assure their reliability. (*People v. Bowel* (1986), 111 Ill. 2d 58, 67, 488 N.E.2d 995; see Fed. R. Evid. 804(b)(3).) Four recognized criteria are: (1) whether the statement was spontaneously made to a close acquaintance soon after the crime; (2) whether the statement is corroborated by other evidence; (3) whether the statement is self-incriminating and against declarant's interest; and (4) whether there is adequate opportunity to cross-examine declarant. *People v. Bowel* (1986), 111 Ill. 2d 58, 67, 488 N.E.2d 995, summarizing *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49.

The circuit court found neither affidavit credible enough to require a new trial, believing they lacked the necessary indicia of trustworthiness. In the Mapp affidavit, the alleged statement by Hawkins was not made soon after the crime, but only after Brown's conviction; it is not corroborated by other evidence except that Hawkins told her three men were involved. Nor is it clear Mapp was a close acquaintance of Hawkins, although Mapp asserted she was a long-time friend of the mother of Hawkins' children. The Cannon affidavit relates a purported statement made the day of the murder by a person other evidence connects with the crime, the use of J.L.'s car, his belt in the car, and his fingerprints found in the car. The assertions concerning the phone call to have the automobile reported stolen are corroborated by Elton Houston's statements to police. This declaration, however, does not explain any other known details of the homicide or is it shown that the statement could not have been obtained before trial in the exercise of due diligence. There is no evidence whether Cannon was a close acquaintance. Finally, Cannon's credibility is at issue because he was an El Rukn serving a natural-life sentence after being convicted of several murders.

■■■ Considering the information in the affidavits, the sources of the affidavits, and the lack of details about the shooting (except that

three people were involved), we cannot say that the circuit court erred in refusing to grant Brown a new trial.

For the foregoing reasons, the record reveals no bases upon which to disturb defendants' convictions by the jury or by the circuit court. We must accordingly affirm.

Affirmed.

STAMOS and SCARIANO, JJ., concur.