THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES PUGH, Defendant-Appellant.

First District (2nd Division)   No. 1—87—0963*

Opinion filed August 22, 1989.

*This case was assigned to the second division on April 24, 1989.

Randolph N. Stone, Public Defender, of Chicago (Edwin Burnette, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Paul Gliatta, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Following a bench trial, defendant was convicted of murder and armed violence. The armed violence count was merged with the murder conviction and defendant was sentenced to 35 years in custody of the Department of Corrections, with three years of mandatory supervised release. Defendant appeals, raising issues concerning the legality of his arrest, the quantum of proof supporting his conviction and his sentence.

Upon defendant's motion to quash arrest and suppress evidence, the circuit court conducted an evidentiary hearing. Defendant testified that on November 9, 1984, at about 10 p.m., he was in his home on Honore Street in Harvey; heard a knock at the side entrance of the building; looked out a window and saw three men, Harvey police officers, standing on the porch, adjacent to the door. Defendant opened the door "slightly" and when one of the men, Detective Frederick Joseph, tried to "force [his] way in," defendant pushed the door shut. Defendant insisted the officers neither identified themselves nor displayed a warrant to him. When he asked them through the closed door whether they had a warrant, Joseph replied "No" and told defendant to open the door because they wanted to talk to him. Defendant complied and Joseph pulled him outside the house. All three officers began to strike him, defendant averred, telling him that he'd "never see the street again" and "You're going to jail, motherfucker." The officers did not identify themselves until they were in the police car with him. Defendant was not asked to go to the police station, but was forced to do so.

Detective Joseph testified that at 3:40 p.m. on November 9, 1984, he and his partner, Wolfson Watson, arrived at an alley at 14712 Maplewood in Harvey to investigate a reported shooting. Joseph spoke to several residents of the surrounding area and learned from one detective at the scene that an individual had seen the suspected offenders leave the area in a "light top over gray primered GM-type car," either a Monte Carlo or a Cutlass. Other persons told the police they heard gunshots.

Joseph proceeded to Ingalls Hospital at 4:30 p.m. and there learned that the victim of the shooting, Robert Davis, had died. He obtained photographs of the body and went to Davis' home, where his mother identified the victim depicted in the photograph as her son. Benjamin Davis, the victim's brother, also at home, informed the police that he saw his brother at approximately 3 p.m. that day, riding in the front passenger seat of a "gray over light blue with primer 1975 Oldsmobile Cutlass"; "Jimmy Pugh" was driving the car and Marcus Hunter sat in the rear seat, passenger side. Benjamin described defendant as short and stocky, weighing approximately 150 pounds. He also gave the officers defendant's address.

Police officers went first to Hunter's house; when they informed Watson and Joseph that Hunter was not at home, they proceeded to defendant's residence on Honore Street at 7 or 8 p.m. Defendant's father told Watson and Joseph his son was not at home. They placed the building under surveillance and, at 10:10 p.m., observed two males walking south on the street. One entered the Pugh residence; the other continued walking. The officers stopped the individual who remained on the street and asked him who had just entered the Pugh house. He replied, "Jimmy Pugh."

Watson and Joseph knocked on the door of the house. When defendant answered, he was asked to step outside. Defendant did so, leaving the door behind him ajar. The detectives announced their office and said "[they] had to have him down at the station to talk to him about the shooting that occurred on Maplewood." According to Joseph, defendant then "attempted to flee back into the house." Watson grabbed defendant's arm, handcuffed him and placed him under arrest.

Joseph maintained that he and Watson were in plainclothes at the time of the arrest and that a uniformed officer joined them later on the porch. Although the individual who answered the door did not identify himself as James Pugh, Joseph averred he recognized defendant based on Benjamin Davis' description. Joseph admitted he had no warrant when he arrested Pugh and that defendant did not go to the

police station voluntarily. He denied pulling defendant out of his house and saying, "You're going to jail, motherfucker."

Watson's testimony as to the events of November 9 tracked that given by Joseph except for the following points: Benjamin Davis described defendant to Watson and Joseph as a black male of medium to dark complexion, short in stature, with close-cropped hair and weighing about 150 pounds. After leaving the Davis residence, the detectives drove first to local hangouts and through the area where witnesses had seen defendant earlier that day. During their initial visit to defendant's home at 8 or 9 p.m., Edward Pugh, defendant's brother, told Watson and Joseph that he owned a 1976 Cutlass, light blue with gray primer on one of the doors, the keys for which he left on his dresser that day and knew neither where the car was nor who had it. Watson testified that they did not see the car described to them earlier at defendant's home. He insisted he never told defendant he'd "never see the street again" or "You're going to jail, motherfucker."

Defendant's motion to quash his arrest for lack of probable cause and to suppress evidence was denied.

At trial, Marcus Hunter, called by the State, testified that he was at a friend's house on the afternoon of November 9 when defendant drove up in a "gray prime" Cutlass. Hunter joined defendant in the car and they drove to a liquor store on 154th Street, where they purchased a six-pack. Hunter maintained that in the course of 10 minutes, he and defendant each drank three beers and shared a joint. They continued to drive until they saw Davis' brother, Nathaniel, who told them they could find Davis "around the corner" at the Davis home. Davis got into the car with Hunter and defendant; defendant stayed in the driver's seat, Davis took the front passenger seat, and Hunter went to the rear of the car, behind Davis.

After purchasing gas at 150th and Dixie Highway, defendant stopped the car in an alley near Maplewood Street. Defendant got out of the car, walked to and opened the front passenger door, and told Davis that he (defendant) "wanted his money." Davis responded, "What?" and got out of the car. Davis and defendant then began "tussling" or "wrestling." After the men fought for "a couple of minutes," Hunter got out of the back seat of the car to break up the fight and succeeded in "holding Robert back," when defendant reached into the back passenger seat of the car and retrieved a "big, black revolver." Hunter did not observe anything in Davis' hands. When he saw defendant advancing toward him with the gun, Hunter "dove" back into the car, and defendant began firing the gun at Davis. As defendant approached Davis, Davis started "backing up" and then

turned and attempted to run once defendant started shooting. Davis fell to the ground about 5 to 10 feet from where he started. Defendant walked up to Davis as he lay on the ground. Davis said, "I'll give you the money, man, just don't kill me." Defendant shot him again and then reached into Davis' jacket pocket and retrieved some money. He ran back to the car with the gun and money still in his hands, which he placed on the front car seat. Defendant drove to his home and there told Hunter that if he informed anyone about the shooting, he would kill Hunter, too. Hunter left the car and went home, taking neither the gun nor any of the money with him.

Hunter described Davis as 6 feet, 2 inches tall, and defendant as 5 feet, 6 inches tall. Hunter admitted Davis was "a much bigger guy than" defendant, but denied he "dragged the big guy off the small guy" when he broke up the fight; he just "separated them both." Hunter did not. see defendant's gun when he got into the car and did not know to whom it belonged.

Hunter denied being with defendant on November 8 when defendant gave money to Davis to purchase some pot, but admitted that on the day of the shooting, Davis and defendant had planned to drive to Chicago in order to buy drugs. He did not believe defendant was under the influence of alcohol or narcotics at the time he shot Davis. Hunter did not run away when defendant began to fire because he was afraid he would get shot, too.

Joseph reiterated his testimony of the pretrial hearing and added that following defendant's arrest at his home, the officers took defendant to the police station in their car. Defendant initially denied any knowledge of the shooting, but later, at 4:45 p.m. on November 10, defendant gave a written statement to the police, admitting the shooting. Joseph read the statement into evidence, the material portions of which included:

"I drove to Maplewood and went down the alley. I stopped [sic] car. *** Robert Davis and Mark [sic] Hunter and I got out [sic] the car. Marcus and I were wrestling with Robert. Robert tried to flee. I reached in under the seat and pulled out the gun that Marcus had put under the seat. I shot him three times. Robert Davis was about ten feet away.

I then ran back to the car. Marcus Hunter jumped in and I sped off."

Joseph said Hunter told him at the police station on November 9 that defendant shot Davis as Davis ran from defendant and that after Davis fell to the ground, defendant took money from him. Joseph did not recall, however, Hunter telling him that Davis said, "Jimmy,

please don't kill me" or "Please don't hurt me." Joseph did not remember Hunter saying defendant shot Davis as he was on the ground.

At the close of the State's case, the parties stipulated to certain testimony relating to: gunshots heard by neighbors; the sighting of the auto emerging from the alley; descriptions of the car's occupants; and testimony of an expert in forensic medicine, Dr. Barry Lifschultz, who performed an autopsy on Davis on November 10, 1984, and concluded that he died as the result of multiple gunshot wounds, which entered his body in the right upper back, the lateral aspect of his upper left arm, the middle of his chest and in his lower left back.

Defendant testified on his own behalf. While driving his brother's car on the afternoon of November 9, he picked up Hunter in front of a friend's home. Hunter had a gun with him, which defendant saw when Hunter got in the car and placed the weapon on the seat. Defendant had seen Hunter carry a gun before. Davis had money belonging to defendant which they were supposed to use to buy pot in Chicago. Once he joined Hunter and defendant in the car, Davis indicated he did not have the money. Defendant went instead to a gas station, and then stopped near the area where Hunter was supposed to get out. Defendant asked Davis for the money. Davis laughed and said, "Who do you think you are?" Defendant got out of the car, walked to the passenger side of the vehicle and asked again for his money. Davis responded by "taking a swing" at defendant; defendant did the same to Davis; both missed. Davis then got out of the car and "came swinging four real punches" at defendant which hit defendant on the ear and side of the face and were strong enough to blur his vision and cause him to stagger. The "tussel" lasted five to six minutes. Davis hit defendant three times. Defendant never fell to the ground and the blows from Davis' fists never broke defendant's skin.

Hunter "got [defendant] loose" by taking hold of Davis' hands and defendant ran to the car. Davis was three to four feet from defendant. Defendant retrieved the loaded gun from the car and began to fire rapidly at Davis, "aiming at his shoulder." The first and second shots hit Davis in his side, the third and fourth shots struck his back. Davis did not try to run from him and did not say "[d]on't shoot me" or "[d]on't kill me." Defendant took $45 from Davis' coat pocket as he lay on the ground. Afterwards, Hunter, who was standing near the bumper of the car, said, "Let's get out of here," and they drove to defendant's home. When Hunter left the automobile, he took the gun with him.

Defendant swore he did not intend to shoot Davis when they first

arrived in the alley, but recovered the gun from the car because he believed Davis was going to try and hurt defendant, hit defendant again and that defendant couldn't win. Defendant estimated Davis' height as 6 feet, 5 inches, and his own as 5 feet, 5 inches. By the time defendant fired his third shot, he was no longer afraid of Davis. Davis had nothing in his hands at the time he was shot. Once Davis saw the gun in defendant's hand, he made no attempt to approach him.

# I

Defendant initially contends the circuit court erred in denying his motion to quash arrest and suppress evidence, maintaining the police lacked probable cause to arrest him on November 9.

■ Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe the suspect has committed or is committing a crime. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475.) This determination is guided by an exercise of common sense, not an application of legal technicalities. (*People v. Montgomery*, 112 Ill. 2d at 525; *People v. Houston* (1986), 151 Ill. App. 3d 102, 108, 502 N.E.2d 1111; *People v. Matthews* (1985), 137 Ill. App. 3d 870, 874, 485 N.E.2d 403.) Only where a finding of probable cause constitutes manifest error can a reviewing court reverse that ruling. *People v. Matthews*, 137 Ill. App. 3d at 874.

Joseph testified at the pretrial hearing that he and Watson learned at the crime scene that: several shots were fired sometime after 3 p.m.; a light blue with gray primer Cutlass, Grand Prix or Monte Carlo automobile, carrying two black males, was seen leaving the alley; and an individual had been shot. The investigation thereafter revealed the victim's identification and information that he had been seen immediately preceding the shooting in a car matching the automobile observed on Maplewood. The detectives knew that a car matching the description of the car in which the victim was a passenger was being driven by defendant just before the shooting and that the car was owned by defendant's brother. They knew that defendant's brother left the car's keys lying on top of a dresser in the same house where defendant lived. The detectives obtained positive identifications of Davis' companions, including their names, narrowing the number of likely suspects to two, defendant and Hunter.

■ Defendant claims that the remaining uncertainty as to whether he or Hunter was the culpable party demonstrated that the police arrested him based on a mere suspicion, not probable cause. In *People v. Montgomery*, however, the supreme court found defendant's

arrest constitutionally sound although defendant was only "part of a relatively small class of people who could have had the opportunity to commit the murders" in question. The probabilities raised by this fact, viewed in the totality of all other facts known to the officers, could lead a reasonable person to believe defendant responsible for the crime. *People v. Montgomery*, 112 Ill. 2d at 526.

■ Upon learning why Joseph and Watson wished to speak to him, moreover, defendant attempted to flee, an additional factor supporting the finding of probable cause. (*People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 434, 505 N.E.2d 1228; *People v. Matthews*, 137 Ill. App. 3d at 875.) Defendant avers that the police dragged him from his home, denying him the opportunity even to attempt flight. The circuit court accepted instead the officers' characterization of events, a determination of credibility well within the province of the court. (See *People v. Brannon* (1978), 59 Ill. App. 3d 531, 533, 375 N.E.2d 840.) The finding of probable cause was not manifestly erroneous, and the motion was properly denied.

## II

Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt of murder "where there was evidence of a sudden and intense passion resulting from intense provocation from decedent."

■■ ■ Defendant asserts his conviction must be reduced to manslaughter because he and Davis were engaged in "mutual combat" at the time of Davis' death, prompting defendant to act "under a sudden and intense passion resulting from a serious provocation by" Davis. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).) "Mutual combat" may qualify as "serious provocation" (*People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270), but only if the decedent's conduct is sufficient to unleash an intense passion in a reasonable person. (*People v. Neal*, 112 Ill. App. 3d at 967.) The provocation must be proportionate to the manner in which defendant retaliated. (*People v. Stanley* (1986), 146 Ill. App. 3d 912, 920, 497 N.E.2d 496; *People v. Neal*, 112 Ill. App. 3d at 968.) Where defendant's retaliation is disproportionate, the crime committed is murder, particularly if defendant accomplishes the offense with a deadly weapon. *People v. Neal*, 112 Ill. App. 3d at 968.

The existence of mutual combat in the case *sub judice* is doubtful. Testimony at trial demonstrated that defendant and Davis exchanged blows for a few minutes but, by all accounts, the "tussling" or "wrestling" ceased when Hunter intervened and separated the combatants.

Hunter continued to hold Davis, moreover, as defendant returned to the automobile to get the gun. Hunter did not retreat to the vehicle until he saw the gun in defendant's hand.

Assuming, *arguendo*, that mutual combat had occurred at the crucial time, defendant's response of shooting Davis was not proportionate to any provocation by Davis. Davis, by defendant's own admission, hit him only three times in the course of a fight lasting several minutes. If defendant were to be believed, the blows left his vision slightly blurred and his equilibrium momentarily disturbed, but he was not struck to the ground nor were any of the punches strong enough to break his skin. He recovered quickly enough, moreover, to return to the car, retrieve a gun and then fire several lethal shots at Davis. Significantly, Davis was unarmed. Further, he was wounded not only on the front and side of his body but also twice in the back. Defendant admitted as well that, while he felt some fear of Davis after their initial physical contact, by the time defendant delivered the third shot, into Davis' back, the victim was falling to the ground and he was no longer afraid of him. These actions alone demonstrate a response disproportionate to the emotions Davis' actions would evoke in a reasonable person.

■ The foregoing conclusion is reinforced by evidence that Davis was shot as he attempted to flee; retreat by the victim negates any inference of mutual combat. (*People v. Yates* (1978), 65 Ill. App. 3d 319, 325, 382 N.E.2d 505.) Further, there was evidence that defendant delivered his *coup de grace* as Davis lay on the ground, pleading for his life. Defendant disputes these facts, yet nothing of record is so improbable as to raise a reasonable doubt of defendant's guilt and to warrant rejection of the court's determination of credibility. *People v. Brannon*, 59 Ill. App. 3d at 533.

## III

Defendant argues in the alternative that his behavior on November 9 justifies no more than a finding of voluntary manslaughter because he honestly, albeit unreasonably, believed he exercised justifiable force in the expectation of losing his own life or suffering great bodily harm.

■ Defendant's conviction could be reduced to voluntary manslaughter pursuant to such a finding (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(2)), but whether a homicide constitutes murder or manslaughter is a question of fact for the court; this court's authority to reduce the judgment, therefore, must be exercised with caution. *People v. Falconer* (1988), 168 Ill. App. 3d 618, 623, 522 N.E.2d 903; *People v.*

*Harris* (1987), 154 Ill. App. 3d 308, 317, 506 N.E.2d 1353.

■ The evidence at bar establishes defendant could not have formed a subjective belief, reasonable or unreasonable, that the force he exercised to "defend" himself was necessary. (*People v. Falconer*, 168 Ill. App. 3d at 623; *People v. Harris*, 154 Ill. App. 3d at 317.) He peppered bullets at close range into the body of an unarmed man who not only made no attempt to approach him, but tried to retreat as he was shot. Even as Davis lay on the ground begging for his mercy, defendant fired again. The trial evidence is consistent with a finding of murder and cannot be disturbed.

## IV

Defendant argues in closing that the circuit court violated his eighth amendment right to a fair and impartial sentence by considering a written victim impact statement (VIS) authored by Davis' sister, Lillian Trainer, and her testimony rendered pursuant to that statement.

■ Defendant relies principally on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, in which the United States Supreme Court held unconstitutional the introduction of a VIS at the sentencing phase of a capital murder trial. The court expressly stated, however, that the principles enunciated in *Booth* did not preclude introduction of VIS' in noncapital cases, such as the appeal at bar. (*Booth v. Maryland*, 496 U.S. at 507 n.10, 96 L. Ed. 2d at 451 n.10, 107 S. Ct. at 2535 n.10.) Our supreme court recently ruled that introduction of a VIS at the sentencing phase of a noncapital case does not impinge upon a defendant's constitutional rights. *People v. Turner* (1989), 128 Ill. 2d 540, 577-78.

■ Illinois circuit courts, moreover, are vested with discretion to impose on convicted criminals sentences the court deems appropriate. (*People v. Clemons* (1988), 175 Ill. App. 3d 7, 12, 529 N.E.2d 577.) In recognition of this discretion, reviewing courts give great weight and deference to a circuit court decision, disturbing the sentence only where that discretion has been abused. *People v. Clemons*, 175 Ill. App. 3d at 12.

■ One of the factors to which the court must apply its "independent assessment" (Ill. Rev. Stat. 1987, ch. 38, par. 1005—4—1(b)) in determining the proper sentence is statements directed to the court by victims of violent crime regarding the impact of the crime on the victim. (*People v. Clemons*, 175 Ill. App. 3d at 13; *People v. Hines* (1988), 165 Ill. App. 3d 289, 302, 518 N.E.2d 1362; Ill. Rev. Stat. 1987, ch. 38, pars. 1005—4—1(a)(6), 1406.) "Victim" includes the sib-

ling of the actual victim of the crime. *People v. Hines*, 165 Ill. App. 3d at 302; Ill. Rev. Stat. 1987, ch. 38, par. 1403(a)(3).

At the sentencing hearing in the present case, the court considered several matters before reaching its decision, including a presentence investigation report, arguments in aggravation and mitigation, defendant's own statement to the court, and Trainer's written VIS, in which she expressed outrage at her brother's death and a desire for justice. She explained that Davis' death forced her to discontinue her education to support remaining family members. Trainer wrote also of the need to vindicate the rights of victims and for retaliation against criminals.

The court allowed Trainer to testify at the sentencing hearing in order to read the written statement into the record. Although Trainer strayed from the text of the statement, she reiterated essentially the same sentiments contained in the VIS. The court assured defense counsel it was capable of distinguishing Trainer's "editorial comments" from substantive remarks concerning the impact Davis' death had upon the family. When Trainer did digress from pertinent facts, the court several times directed her to limit her testimony to the loss visited upon individual family members by Davis' death.

■■ Defendant portrays Trainer's presentation, both written and oral, as inflammatory, irrelevant, and prejudicial, and therefore inappropriate for the court's consideration. This court found in *People v. Hines* (165 Ill. App. 3d at 302), however, that a VIS expressing a desire that the defendant be harshly punished did not violate his eighth amendment rights. Furthermore, no evidence of record rebuts the presumption that the court considered only competent evidence in entering defendant's sentence. (*People v. Phillips* (1989), 127 Ill. 2d 499, 537.) Statements from the bench during the hearing illustrated the court's ability to distinguish relevant and proper remarks from prejudicial or immaterial evidence. In imposing sentence, the court commented only on defendant's criminal history and the need to deter others from committing the same or similar crimes. The court did not abuse its discretion by admitting into evidence Trainer's VIS and testimony.

For the reasons set forth above, there are no bases upon which to disturb defendant's conviction or sentence. Accordingly, we affirm.

Affirmed.

BILANDIC, P.J., and DiVITO, J., concur.