THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ALONZO C. WALDROUD, Defendant-Appellant.

First District (5th Division)   No. 84—0845

Opinion filed November 6, 1987.

PINCHAM, J., dissenting.

Steven Clark and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Patrick J. Foley, Assistant State's Attorneys, of counsel), for the People.

*JUSTICE MURRAY delivered the opinion of the court:

This is an appeal by defendant, Alonzo Waldroud,[1] from a January 20, 1984, conviction for armed robbery and sentence of 10 years' imprisonment. The sole issue presented to the court on appeal is the propriety of a trial court's denial of the defendant's motion for a new trial based on newly discovered evidence. For the following reasons we affirm.

The undisputed facts are that defendant Waldroud and P.C., a 15-year-old minor, were indicted on a four-count indictment charging the offenses of armed robbery and armed violence on July 21, 1983. The victims of the offense were Curtis and Sandra Courts.

Waldroud waived a jury trial and was found guilty by the trial judge of the crime of armed robbery. The principal evidence upon which the trial court found the defendant guilty of armed robbery was the testimony of the victims, Sandra Courts and her husband, Curtis Courts. They testified that they went into a multiple-apartment building at 6810 South Dorchester in Chicago, Illinois, to pick up Sandra Courts' sister. They had never been in the apartment before. Not finding the sister's apartment, as they began to leave the building they were approached on a stairwell landing in the building by two men. One pulled a gun and announced a "stick up." The time of the occurrence was 5:20 in the afternoon of July 21, 1983.

Sandra Courts testified as to the lighting conditions at the time, as follows:

"Q. Now, on this landing when they were taking the property from you, are there any lights?

A. Yes, it is.

Q. Approximately how many lights, if you recall?

---

*Justice Mejda, retired, sat on oral argument. Justice Murray substituted and read briefs and listened to tape.

[1]The record is confusing as to defendant's name. He is referred to as Alonzo Waldroup in the caption of the report of proceedings but is called Alonzo Waldroud in the briefs.

A. It was well lit up. It was like the light right above us.

Q. Was it lighter or darker than the light in this courtroom?

A. It was lighter. It was well lit up."

Curtis Courts testified as to the lighting on the date of the occurrence.

"Q. Now, how was the lighting on that landing on the second floor when these two gentlemen approached you?

A. It was light, well lit."

The amount of $92 or $95 was taken from Curtis by the robbers and they took a watch from Sandra. Both Sandra and Curtis identified the defendant at the trial as one of the men who robbed them.

Sometime after the robbery the Courtses observed the two men that robbed them crossing the street. Sandra Courts called the police. Sandra pointed to two men on a porch with others directly across the street from the building within which they were robbed. She testified:

"As the police car was pulling up I told the officer there was the two on the porch, that I seen the two on the porch that had robbed us."

When the police officer jumped out of the car, the two men and others on the porch entered the building. When the police officer entered the building and then came outside, he had one of the robbers, according to the Courtses' testimony. He then returned into the building and came out with the defendant, according to Susan Courts' testimony.

Officer Robert Taylor testified that Officer Weatherby, while searching a closet in the building, observed and apprehended defendant. Officer Taylor testified that "he [defendant] was placed under arrest after being positively identified by both victims as being the offender." Officer Weatherby identified defendant as being "in the closet underneath the clothing."

Officer Taylor also testified he found $31 and a Timex wristwatch, proceeds of the robbery, under one of the robbers (not defendant) when he arrested him while lying in the bed in the same apartment where defendant was apprehended in the closet.

After trial, defendant, in an amended motion for a new trial, filed the affidavit of K.C., the mother of Waldroud's codefendant. In her affidavit, after attesting to knowledge of the apartment building where defendant was robbed, she stated that on July 14, 1983, there were no lights on the stairwell where the robbery occurred and to her knowledge no repairs had been made to improve the lighting conditions from July 14, 1982, to July 21, 1983, the date of the robbery.

Also, an affidavit was filed by Kevin Patterson, an investigator

employed by the defendant's counsel after trial. He stated that on January 5, 6, and 8, 1984, (six months after the event), he visited the situs of the crime and found no lights. He further stated that nothing could be seen clearly on the first three floors of the building. He suggested the names of three witnesses who he stated would testify to the lighting conditions and to the Courtses' reputation as drug users or dealers. In an apparent attempt to explain his failure to discover the evidence concerning the lighting conditions, defendant's trial counsel stated that he visited the scene sometime after his appointment and that between the date of the crime and September 23, 1983, unbeknown to him, the building had undergone substantial renovation.

■■ ■ It is a settled rule of law that applications for a new trial on the grounds of newly discovered evidence are not looked upon with favor by the courts. In order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice as a last resort, to escape the consequence of an adverse verdict, such application should always be subject to the closest scrutiny by the court. The burden is upon the applicant to rebut the presumption that the verdict is correct and to show no lack of diligence. The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse. *People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199.

■■ ■ To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the outcome of the trial on retrial; it must be material to the issue and not cumulative; and it must be discovered since the trial and could not have been discoverable prior to trial by the exercise of reasonable diligence. (*People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.) Generally, evidence which serves only to impeach is not a justification for the granting of a new trial. (*People v. Johnson* (1978), 60 Ill. App. 3d 183, 376 N.E.2d 381.) Recently this court held that newly discovered evidence sufficient to warrant a new trial must be material, so conclusive that it will change the result, and incapable of being discovered prior to trial by the exercise of due diligence. *People v. Houston* (1986), 151 Ill. App. 3d 102, 502 N.E.2d 1111.

Based on these comparatively rigid standards, this court cannot conclude that the trial judge abused his discretion in denying Waldroud a new trial based on the Courtses' identification of him as one of the persons who robbed them.

First, the evidence relating to the lighting conditions of the locus of the crime could have been discovered before trial by the same type of investigation made by defendant's counsel after trial. The fact that

defendant was apparently incarcerated from the day of his arrest on July 21, 1983, did not preclude an investigation by the attorney or his investigator of the scene prior to or during trial. The defendant was apprehended on July 12, 1983; his trial did not commence until November 21, 1983.

Further, the affidavit of Patterson as to his interview of Berdean Wingo and Jeanette Jackson as to the lighting in July 1983 and to the knowledge of Curtis and Sandra's selling drugs is defective. A motion for a new trial must be accompanied by defendant's affidavit showing his lack of prior knowledge of this evidence and his diligence in obtaining it. In addition, defendant must attach additional affidavits of the witnesses who would testify concerning the new evidence or retrial unless the lack of such affidavits is sufficiently explained. (*People v. Gray* (1981), 96 Ill. App. 3d 757, 422 N.E.2d 45.) Wingo and Jackson did not submit affidavits nor is the lack of their affidavits explained.

The affidavit of Waldroud's codefendant's mother, at best, impeaches the Courtses' testimony concerning the lighting at the scene by implication. Her last visit to the apartment, according to her affidavit, was July 14, 1983, a week before the occurrence. The affidavit does not directly impeach the Courtses' positive identification of defendant made on the date of the crime or their in-court identification.

The material submitted by defendant does not indicate or suggest that the result of the new evidence would change the outcome of the trial. A revised opinion of the State's expert which supported defendant's theory that a gun accidentally discharged was held not of a nature that would change the trial's outcome and did not entitle a defendant to a new trial. (*People v. Lovitz* (1984), 127 Ill. App. 3d 390, 468 N.E.2d 1010.) The confession by defendant's cousin that he, not defendant, committed the armed robbery of which defendant was convicted was held not to be of sufficient conclusive character as to probably change the outcome of defendant's trial. (*People v. Johnson* (1986), 148 Ill. App. 3d 163, 498 N.E.2d 816.) The same is true here. The newly discovered evidence as to the lighting at the scene one week before the crime was not such as to probably change the outcome of defendant's trial.

Accordingly, we affirm.

Affirmed.

LORENZ, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. Initially, the trial court determined that the stairwell robbery scene was electrically well lighted and relied upon this determination to find the defendant guilty. Subsequently, the trial court determined that the stairwell robbery scene was naturally lighted, and relied on this contrary determination to deny the defendant's motion for a new trial. (Similarly, in affirming the trial court's denial of the motion for a new trial, the majority relies on grounds different from the grounds on which the trial court relied in denying the motion.) Second, the trial court improperly applied erroneous legal principles; third, the trial court misinterpreted the rules of law applicable to a motion for a new trial based on newly discovered evidence; fourth, the trial court distorted the trial evidence; fifth, the trial court misconstrued the newly discovered evidence; and sixth, the trial court resorted to a grossly illogical and convoluted rationale in denying the motion for a new trial. In so doing the trial court patently abused its discretion.

As the majority accurately points out, the rules of law applicable to a motion for a new trial based on newly discovered evidence are designed to prevent injustice and fraud that "defeated parties may be tempted to practice as a last resort, to escape the consequence of an adverse verdict." (163 Ill. App. 3d at 319.) This principle tacitly ignores, however, a litigant's temptation, or lack thereof, to practice fraud and fabrication during the trial proceedings to obtain a desired result in the first instance. This principle likewise fails to adequately perceive conceivable authentic, legitimate, genuine newly discovered evidence.

Thus, in scrutinizing newly discovered evidence, it is proper to consider the source and nature of the original trial evidence, as well as the source, the method of discovery and the nature of the newly discovered evidence. The more appropriate means to test, evaluate, authenticate or discredit the newly discovered evidence, however, is the reliable, tried and true confrontation, cross-examination and credibility trial process, which cannot be satisfactorily accomplished within the trial court's limited focus of determining the validity of the new trial motion based on the newly discovered evidence. The defendant was not seeking an acquittal of the robbery charges based on the newly discovered evidence during the motion for a new trial proceeding. Rather, he was merely seeking an opportunity to present the newly discovered evidence in a trial proceeding to accurately resolve the question of his innocence or guilt.

The rules of law applicable to a motion for a new trial based on

newly discovered evidence are by no means designed to defeat justice. An analytical review of the trial proceedings in the instant cause clearly reveals that these rules were erroneously applied and that justice has been thereby defeated.

The trial procedure and the facts on which Waldroud was found guilty follow. Alonzo Waldroud and P.C., a 15-year-old minor, were charged in a four-count indictment with having, on July 21, 1983, in Chicago, Illinois, committed the offenses of armed robbery and armed violence of Curtis Courts and Sandra Courts, in violation of sections 18—2 and 33A—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 18—2(a), 33A—2).

Waldroud presented his motion for a severance from the trial of the codefendant P.C. P.C.'s attorney then requested a conference with the trial court and the prosecuting attorney pursuant to Illinois Supreme Court Rule 402 (107 Ill. 2d R. 402), in anticipation that P.C. would enter a guilty plea to the charges. The trial court advised P.C. that in the conference the prosecutor would inform the trial court of the facts of the case and P.C.'s criminal background, "to see whether your case can be settled, disposed of, without going to trial." P.C. stated to the court that he understood what would happen at the conference and that he wished to have a conference. The conference was held. Thereafter Waldroud's severance motion and P.C.'s trial were continued to November 21, 1983.

On November 21, 1983, Waldroud's attorney stated to the court:

> "[Y]our Honor, on my last appearance I filed, gave notice to the State that I would be filing a motion to produce asking the State to supply us with any written notes of the conversation in possession of either the State's Attorney or the Chicago Police Department of a conversation between a detective, law enforcement officer and Orlando Boykin, B-o-y-k-i-n. The detectives' names appear in the police reports. Your Honor, those detectives' names are Habiak, H-a-b-i-a-k, Star No. 14939, Area 1 Violent Crimes, and Detective Salvatore, S-a-l-v-a-t-o-r-e, Star No. 13636, Area 1 Violent Crimes."

In response to the trial court's inquiry, Waldroud's attorney stated that he intended to call Boykin as a defense witness. Waldroud's attorney further stated to the trial court:

> "[W]hen my client was arrested, the first chance he had to make a statement to a detective and/or a uniformed police officer, he told them that on the day and time of the alleged incident that is the basis of this charge, that he was with Orlando Boykin and he gave a statement as to what they did. He told

the police how to reach Orlando Boykin and I believe there is some indication in the police report that indeed one of those two detectives did in fact place a call to Mr. Boykin. There is nothing else in the police reports that indicates what was the result of that call.

* * *

And Mr. Boykin, your honor, indeed has notified me that a person who identified himself as a police officer in fact talked to him on the telephone."

Thereupon, Waldroud's attorney answered ready for trial. P.C.'s attorney stated to the court, "[I] believe [P.C.] is in a different situation, that we had reached an agreement on [P.C.]. I talked with the State's Attorney. He's not sure whether he wants to do a plea before or after [Waldroud's] trial. We'll put it over until 1:00 o'clock and we'll take the plea then or wait until after trial." P.C.'s case was postponed to 1 o'clock. The trial court, upon being then told by Waldroud's attorney that Waldroud desired to waive trial by jury, advised Waldroud of his right to trial by jury and Waldroud waived jury trial. Waldroud's trial was postponed to 1 o'clock, at which time Waldroud's trial commenced.

The pertinent evidence at trial was as follows. Sandra Courts and her husband, Curtis Courts, testified that on July 21, 1983, at approximately 5:20 p.m., they went to the multiple apartment court-way building complex at 6812 South Dorchester Avenue to pick up Sandra Courts' sister from Detroit, who was staying with friends in the building. Sandra and Curtis had never been in the building before and they did not know in which apartment the sister was visiting. They testified that they went to the second floor, knocked on several doors in an attempt to locate the apartment in which Sandra's sister was visiting, but no one answered at any of the doors. As Sandra and Curtis descended the stairs to leave the building, two men approached them on the stairwell landing. One pulled a gun and announced a holdup. The defendant, Alonzo Waldroud, was identified in court by Sandra and Curtis as one of the robbers. The prosecutor elicited a description of the other robber from Sandra and Curtis by asking them to compare the complexion of the other robber to the complexion of the defendant Waldroud. Both testified that the other robber was lighter complected than the defendant. Sandra testified that the lighter complected robber removed a wrist watch and a pouch from her left wrist and the darker-complected robber removed Curtis' wallet from his pocket and threw the identification from the wallet on the floor.

Sandra Courts testified on direct-examination:

"Q. *Now, on this landing when they were taking the property from you, are there any lights?*

A. *Yes, it is.*

Q. *Approximately how many lights, if you recall?*

A. *It was well lit up. It was like the light right above us.*

Q. Was it lighter or darker than the light in this courtroom?

A. It was lighter. It was well lit up." (Emphasis added.)

Sandra Courts testified on cross-examination:

"Q. In the entire stairwell you walked on there was only one window, is that right?

A. Yes.

\* \* \*

Q. And there was no light at the top of the third stairs was there?

A. It was lit up.

Q. There's no light at the top of the third stair?

A. *Yes, there was a light in the hallway where I was.*

Q. At the top of the third floor stairwell there was no light, was there?

A. Yes, it was." (Emphasis added.)

Sandra Courts testified on redirect examination:

"Q. *Now, ma'am, you mentioned there was light on the landing?*

A. *Yes, it was.*

Q. *There was an electric bulb lamp that you were describing?*

A. *Yes.*" (Emphasis added.)

Curtis Courts testified that it was "well lit" on the second-floor landing where they were robbed by the two men, that it was as light there as it was in the courtroom, but he did not know how many lights were there.

The Courtses testified further that the robbers took their money, but returned a telephone book, credit cards and keys to them; that the lighter-complected robber told them to get up the stairs by the time he finished counting to 10. Sandra obeyed, but Curtis first picked up his identification and only after a warning from the lighter-complected robber did he go upstairs. The Courtses waited until they heard the robbers leave the building and then the Courtses left the building.

The Courtses went to their car, drove at least a block and returned to 6810 South Dorchester to look for the robbers, at which time the Courtses saw the robbers walking in front of the Courtses'

car directly across the street to the building at 6819 South Dorchester. The Courtses went a block away to a telephone and reported the robbery to the police, who arrived shortly. The officers took the Courtses in separate cars and approached 6819 South Dorchester. The Courtses told the officers that the robbers were on the porch at 6819 South Dorchester with a group of about 8 to 10 people. The officers got out of their cars and approached the people on the porch. All the people on the porch ran either into the building or down the street.

Sandra Courts testified that one of the officers entered the building and came out shortly thereafter with the lighter-complected robber and that the officer reentered the building and returned with the dark-complected robber. Curtis Courts testified that the officer brought the lighter-complected robber, the defendant and two other men out of the building at the same time and he then identified the defendant Waldroud and P.C. as the two robbers.

Officer Robert Taylor testified that he talked to the Courtses shortly after he met them and they told him they had been robbed of $94, a lady's watch and miscellaneous identification and credit cards. Officer Taylor followed the people who ran into the building and returned to the porch with two of them. One of the Courtses told him that neither of the people he had in custody was either of the robbers. Taylor reentered the building and went to a second-floor bedroom. A male was lying on the bed. He questioned the male and when the male arose from the bed, Taylor saw that he had been lying on $31, a woman's watch and miscellaneous pieces of identification. Taylor immediately arrested the male. The male was the codefendant P.C. Officers Robert Taylor and Houston Weatherly then searched the bedroom closet. They found Waldroud hiding under a pile of clothing and arrested him. Waldroud had nothing in his possession when he was arrested.

Orlando Boykin was a spectator in the courtroom while Taylor testified. On cross-examination of Taylor, Boykin was directed by defense counsel to stand and Officer Taylor testified that he did not see Boykin when he approached the people on the porch. Officer Houston Weatherly's testimony was substantially the same as the testimony of Officer Robert Taylor. The State rested.

Boykin was called as a defense witness. He testified that on the morning of July 21, 1983, Waldroud called him and asked him to help him move some of his personal belongings from Waldroud's house to Waldroud's mother's home. Boykin arrived at Waldroud's house at 3 p.m. and they moved Waldroud's belongings in Boykin's car to Waldroud's mother's house, where they ate, watched television and

talked with Waldroud's brother. Waldroud unpacked some of his clothes. Waldroud and Boykin left between 3:30 and 4 p.m., drove to 68th Street and South Dorchester, parked and walked a block to a liquor store where they bought beer. They then walked a block to an apartment building to buy marijuana. Waldroud purchased the marijuana and he and Boykin sat on the porch at 6819 South Dorchester Avenue with six other people and drank beer. Boykin, Waldroud and the others remained on the porch until about 6 p.m., when the police approached. As the police converged, everyone ran except Boykin and Derrick. Boykin remained on the porch and the officers followed the people into the building. The officers went in and out of the building with the people who had run in the building. Boykin saw the officers bring four or five people out of the building and then Waldroud, whom they took away. Boykin did not know P.C.

Alonzo Waldroud testified in his own behalf. His testimony was the same as Boykin's. Waldroud testified that after leaving his other's house he and Boykin drove to 6819 South Dorchester Avenue, the residence of Roger Parker. He and Boykin walked to the liquor store and purchased some beer. They returned to 6819 South Dorchester Avenue and Waldroud purchased marijuana. They did not smoke it because no one had any cigarette papers. Waldroud put the marijuana in his pocket. Waldroud and his friends, Boykin, Parker, Derrick Hughes and Michael Moore, drank the beer on the porch. When the police approached, everybody on the porch ran in different directions. There were about eight people on the porch. Waldroud testified that he ran from the police because he thought they were coming after him for the marijuana. He ran up the stairs to a second-floor apartment with two other people, one of whom Waldroud came to know later was the codefendant, P.C., a juvenile. Waldroud had never seen P.C. before P.C. arrived on the porch at 6819 South Dorchester Avenue, about 15 or 20 minutes before the police arrived. Waldroud denied going into the closet and testified that he was standing in the living-dining room when the police entered the apartment. Waldroud followed the officers into the bedroom and tossed the marijuana into the closet. Officer Taylor saw him and asked him what he had tossed. Officer Weatherly retrieved the marijuana and arrested him. Waldroud denied that he robbed the Courtses. He testified that after his arrest, he told the detectives at the police station that he was with Boykin at the time the robbery was committed and he gave the detective Boykin's address and telephone number.

On rebuttal Officer Taylor denied knowledge of the confiscation of any marijuana during the arrests and further stated that no persons

remained on the porch after he and the other officers arrived. The State did not call any police officers, however, to rebut Boykin's and the defendant's testimony that immediately after the defendant's arrest they severally told the officers that they were with each other during the course of the afternoon before and at the time the Courtses' robbery was committed. Both sides rested.

Waldroud's counsel argued in closing:

"[T]he only description heard by this court either under direct examination or cross-examination *** they were two male blacks, one was dark skinned, one was light skinned. There is no indication of height, weight, color of hair, the length of the hair, facial hair, clothes or anything else other than one light skinned and one dark skinned black male.

\* \* \*

You have heard the testimony of the two victims of this alleged armed robbery who testified that they were in a hallway, a second-floor hallway, a second landing of a hallway at about 5:20 in the evening. *** *Your Honor heard the testimony by the lady, Mrs. Courts, who said there was a light shining* *** *where she was robbed.* *** I suggest most respectfully it was a dingy drab hallway of a tenement at 68th and Dorchester in which there was no great light and any attempt by the witnesses to testify to this court there was good light is pure fabrication, self-serving fabrication to assist them in making what was at best a very imperfect and marred and unprecise identification." (Emphasis added.)

The prosecuting attorney in his closing argument responded:

"Now, defense counsel made some comments about the lighting on the landing that would have made it, made the identification improbable. Both witnesses testified that the lighting in that hallway, whether it was from the windows or from electric bulbs, was at least as good as the lighting in the courtroom."

In finding Waldroud guilty, the trial court stated:

"The question of the case is the reliability of the identification of Curtis Courts and Sandra Courts. This armed robbery took place in a hallway. *Both witnesses said it was lighted by electric lights.*

\* \* \*

*** [A]t the time that the police approached, the defendant ran. *His testimony was materially weakened* by some key discrepancies as well as the *failure to produce the marijuana that he claimed was the reason for his running.* There will be a

finding of guilty." (Emphasis added.)

It is difficult to understand this reasoning by the trial court. The trial court expressly rejected Waldroud's explanation that he fled from the officers because he feared being apprehended by them while he had the marijuana in his possession because of his "failure to produce the marijuana." This rationale by the trial court was patently fallacious. Waldroud said he ran because he did not want to be caught with the marijuana in his possession. Had Waldroud been apprehended by the officers with the marijuana in his possession, his detention and conviction would have been certain. For him to have shown the officers the marijuana he possessed after his apprehension, either before or after the Courtses identified him as the robber, as his explanation to the officers for fleeing from them, his detention and conviction for the unlawful possession of the marijuana would have been absolutely assured. Thus, the trial court's conclusion that Waldroud's trial testimony was discredited because he did not show the officers the marijuana he possessed as his reason for fleeing them was grossly illogical and specious.

It is clear, however, from the trial court's foregoing statement, *"Both witnesses said [the stairwell] was lighted by electric lights,"* that the trial court relied on the Courtses' testimony that the stairwell landing was electrically lighted in its finding that Waldroud was guilty of the Courtses' robbery.

The trial court granted the defendant's attorney time within which to file post-trial motions and set the motions for hearing.

On the following day, November 22, 1983, the trial court heard and accepted P.C.'s guilty plea to the armed robbery counts. (P.C. was not called by the State as a witness at Waldroud's trial.) In aggravation at P.C.'s sentencing hearing, the prosecuting attorney stated to the trial court:

> "Judge, in aggravation, the Defendant [P.C.] in this case was the individual that seemed to be the leader of these two individuals that robbed the Courtses. He was the man with the gun. He was the individual that seemed to be taking charge in taking the money from the victims, and the possessions, and he seemed to supervise the activities of the co-offender, Waldroud."

P.C. was sentenced to six years in the custody of the juvenile division of the Illinois Department of Corrections.

Catherine Carswell, the mother of the codefendant, P.C., was present during Waldroud's trial on November 21, 1983. She heard the Courtses testify that the stairwell in the apartment building at 6810

South Dorchester where the Courtses were robbed was electrically well-lighted. Mrs. Carswell had lived in the apartment building. As Waldroud's attorney departed the courtroom after the conclusion of Waldroud's trial, Mrs. Carswell told Waldroud's attorney that as of July 14, 1983, the building had been condemned, was scheduled for renovation, all the tenants had been ordered to move out of the building and that there were no lights in the stairwell of the building on July 21, 1983. Based on this newly acquired information, Waldroud's attorney retained Kevin Patterson to investigate the lighting conditions of the hallway at the apartment building on the date of the robberies. Patterson set forth his investigation and results in an affidavit, which, with the affidavit of Mrs. Carswell, Waldroud's attorney on January 20, 1984, presented to the trial court, in support of Waldroud's motion for a new trial based on newly discovered evidence.

Waldroud's attorney stated to the trial court in support of the motion for a new trial, the following:

"Your Honor, to refresh your recollection, I was appointed on this case by your Honor on September 23, 1983 ***.

The alleged crime happened on July 21, 1983. ***.

Your Honor, sometime after my appointment, within a few weeks, I did have occasion to visit the alleged scene of the alleged crime at 6810 South Dorchester.

Unbeknownest [sic] to me, your Honor, between the time of, between the time of the crime, 21st day of July and the 23rd day of September, that building at 6810 Dorchester had undergone substantial renovations.

Your Honor, there was no way for me to have known that ***.

*** [T]he information which I found out after the trial in regards to that building having been renovated and my knowledge of that building as it existed on the time after my appointment in fact is new evidence or evidence I could not have known about.

*** [O]n the day in question of the alleged crime, July 21, 1983, that building was later found out by me was in fact a condemned building. In fact, all of the people *** who lived in that building on or before the 21st day of July, 1983, were in fact requested to move because of that condemnation.

The cause of the condemnation, among other things, [was] the fact there was no electricity in the building ***.

*** [T]he issue that the case boiled down to was in fact eyewitness evidence and the ability of the eyewitnesses, the

Courts, in this case, to observe the two gentlemen who arm robbed them.

\* \* \*

\*\*\* [T]he testimony of the Courts was that there was an electric light on the landing on which the alleged robbery happened \*\*\* and they testified as to the brightness of the artificial light \*\*\*.

\*\*\* [W]hile walking out of this very courtroom after the trial, the mother, Mrs. Carswell, the mother of the co-defendant for the public defender's client, who was not on trial, volunteered to me upon leaving the building that indeed she on the date in question or shortly before the date in question, the 21st day of July, had been a resident of that building and that it had been condemned and that everyone was asked to move and there was no electricity.

\* \* \*

\*\*\* [T]he information Mrs. Carswell gave me \*\*\* was in fact new evidence.

\*\*\* [U]pon learning that I indeed retained an investigator who is present in court, Mr. Kevin Patterson, who did go out to the scene of the crime again to ascertain the extent of renovations, did, after contact[ing] Mrs. Carswell, did find out people who had lived in that building at the time of the alleged robbery who would also testify as to the nature of the lighting and the nature of the electrical service and the nature of the natural light present in that building.

That, too, is new evidence, your Honor, based upon that having come to our attention after the conversation with Mrs. Carswell which happened after the trial.

\* \* \*

\*\*\* [T]he witnesses whose affidavits are referred to or incorporated in our motion, were to testify, that this court and or jury in this court could indeed arrive at a different finding based on that new evidence."

The affidavits to which Waldroud's attorney referred were the affidavits of Mrs. Catherine Carswell, mother of the codefendant, P.C., and Kevin Patterson, the investigator retained by Waldroud's attorney. These affidavits are appended hereto.

Mrs. Carswell's affidavit stated that she resided at 6806 South Dorchester in the multi-apartment building complex at 6800 to 6820 South Dorchester, from March 7, 1982, to March 8, 1983; that after she moved she frequently visited relatives and friends who still lived

in the apartment complex; that her last visit was on July 14, 1983; that throughout her residency and visits at the apartment complex, the hallway, stairwell and stair landing lights were always out; that on July 14, 1983, she visited a friend at 6810 South Dorchester and there were no lights on the stairwells or on the landings, that on or before July 14, 1983, the entire apartment building complex from 6800 to 6820 South Dorchester had been condemned, was scheduled for renovation and all the tenants had been instructed to move, and that no lighting repairs had been made in the building hallways from July 14, 1983, to July 21, 1983, the date of the robberies.

The investigator, Kevin Patterson, stated in his affidavit that on January 13 and 17, 1984, he interviewed Ms. Berdean Wingo, Mrs. Jeanette Jackson and Mr. Roderick Parker and that each of them told him that they were former residents in the 6800 to 6820 South Dorchester apartment complex before and at the time the Courtses' robbery occurred, that the hallways were very dark and that there were no electric lights in the stairwell and landing at 6810 South Dorchester on the date of the robbery.

There is not the slightest suggestion of fraud in the Patterson or Carswell affidavits or in the statements of Ms. Berdean Wingo, Mrs. Jeanette Jackson or Mr. Roderick Parker. There is no indication whatever that either Patterson or Carswell was biased or partial or had any motive to fabricate, or that either of them had any interest in Waldroud or in the outcome of his case. Mrs. Carswell's son, P.C., had indicated his intent to plead guilty when Mrs. Carswell initially told Waldroud's attorney that the Courtses' testimony that the stairwell robbery scene was electrically lighted was false. Her son had pleaded guilty and had been sentenced to six years' imprisonment when Mrs. Carswell gave Investigator Patterson her affidavit to that effect. The newly discovered evidence that there was no electric lighting at the stairwell robbery scene could have been readily contradicted by Commonwealth Edison or the building records. No ulterior conduct in the acquisition of the newly discovered evidence was attempted to be attributed to the defendant, who had been in custody since his arrest, and the integrity of Waldroud's court-appointed attorney was in no way questioned or challenged.

The majority in the case at bar relies on the defectiveness of Patterson's affidavit and the absence of affidavits of Wingo and Jackson in affirming the trial court's denial of the motion for a new trial. The majority states: "[T]he affidavit of Patterson as to his interview of Berdean Wingo and Jeanette Jackson as to the lighting *** is defective. *** Wingo and Jackson did not submit affidavits nor is the

lack of their affidavits explained." 163 Ill. App. 3d at 320.

The trial court, however, did not rely on either of these grounds in denying the motion for a new trial. It is indeed noteworthy that in opposition to the defendant's post-trial motion for a new trial based on the newly discovered evidence that there were no electric lights at the stairwell robbery scene, the prosecuting attorney never contended that the affidavits and statements of Mrs. Carswell, Kevin Patterson, Roderick Parker, Ms. Berdean Wingo and Mrs. Jeanette Jackson were defective, inaccurate or false. The prosecutor did not challenge the veracity or integrity of the affidavits or statements. Instead, the prosecutor adroitly shifted positions—from artificial electric lighting to natural lighting through a stairwell window at the stairwell robbery scene.

At the hearing of the defendant's motion for a new trial based on the newly discovered evidence, the prosecuting attorney abandoned the Courtses' trial testimony that the robbery scene was electrically lighted. The prosecuting attorney argued:

> "There's been no evidence at trial regarding the fact whether or not there was electricity in the building."

Diametrically opposed to his trial position, the prosecuting attorney further conversely urged during the post-trial hearing of the motion for a new trial:

> "Your Honor, in that respect, you heard testimony from both Sandra Courts and Curtis Courts that the lighting was very good in the hallway at that time.
>
> They certainly did not have an opportunity nor did they testify that they counted the number of artificial lights in the hallway, *they just mentioned the possibility of artificial lights.*
>
> *In fact, the lighting that they did describe particularly was natural lighting from a window above the second-floor landing.*[2]
>
> In fact, Sandra Courts became specific and stated that it was about a two or three-foot stairwell window.
>
> Your Honor, the time of the armed robbery was 5:20 in the afternoon hours on July 21, 1983. Your Honor, I would submit that during the month of July, the sunlight appears the latest in the evening hours.

---

[2] A cursory reference to the Courtses' testimony, previously set forth herein, reveals that the prosecutor's statements that *"they just mentioned the possibility of artificial lights"* and that *"the lighting they did describe particularly was natural lighting from a window above the second-floor landing"* are clearly erroneous. (Emphasis added.)

I believe that that would leave approximately the [*sic*] more hours after the time of the robbery for natural sunlight.

Your Honor, certainly their testimony is credible that the stairwell could have been well lit from the natural sunlight that was certainly available at 5:20 in the afternoon in the month of July.

Your Honor, that being the case, * * * whether or not there was artificial lighting in the hallway certainly, I think, is irrelevant.

* * *

The only credible evidence that you have is the corroborated evidence of Sandra and Curtis Courts that the landing was well lit.

* * *

Both Sandra Courts and Curtis Courts were in the stairwell lit by that natural light for several minutes during the course of the robbery."

In denying the defendant's motion for a new trial based on the newly discovered evidence, the trial court, as did the prosecuting attorney, abandoned the Courtses' trial testimony that the stairwell landing robbery scene was electrically lighted. In finding the defendant guilty of the robbery offenses, however, the trial court conversely relied on the Courtses' contrary trial testimony that the robbery scene was electrically lighted. When finding Waldroud guilty, the trial court found:

"This armed robbery took place in a hallway. Both witnesses [Sandra Courts and Curtis Courts] said it was lighted by electric lights."

The trial court, however, took a contraposition when it thusly denied the new trial motion:

"[T]he lighting, the issue was carefully considered at the trial in two ways * * * as [the prosecuting attorney] argues, * * * we did have a crime that happened in July at 5:20 in the afternoon.

The building was on the west side of the street, so light would not be shining in the building, but *it is true that there would be, in all likelihood, sufficient daylight which I think is consistent with the testimony.*" (Emphasis added.)

This about-face by the trial court, ignored and unaddressed by the majority, in denying the motion for a new trial constituted a flagrant abuse of the trial court's discretion.

There was other newly discovered evidence on which Waldroud re-

lied for a new trial. Waldroud's attorney additionally stated to the trial court, "We have also new evidence your Honor, which shows that the reputation of the Courtses in the community was that of drug abuse and occasional dealers." The trial court responded, "That would not be admissible." Waldroud's attorney retorted, "I would contend in a new trial it would be admissible, your Honor."

Waldroud's attorney further argued that the newly discovered witnesses would testify at a new trial that the Courtses were not on Dorchester to pick up her sister, as Sandra Courts testified, but, rather, they were in the building to transact a sale of drugs. Waldroud's attorney additionally stated, "We later found out upon finding people who lived in that building on the 21st day of July that the Courtses frequented that complex of buildings because it was a known drug house ***."

The affidavit of Kevin Patterson, the investigator, states, "[Mrs.] Jackson also told affiant that she knew of Curtis and Sandra Courts, and she knew them to be drug addicts and occasionally selling drugs." The Patterson affidavit also states, "Mr. Parker further stated [to affiant] that he knew of Mr. and Mrs. Courts, and that they were known by the community to be drug addicts and that at the time they were robbed, they were leaving a known dope house."

The prosecuting attorney did not deny that the Courtses were drug addicts or dealers. Nor did the prosecutor challenge the veracity of Patterson's affidavit that the Courtses were drug addicts and dealers, or that they were robbed leaving a "known dope house."

In ruling on this newly discovered evidence the trial court stated:

> "The issue about the reputation, if you will, or the allegation within the affidavit that *** Sandra Courts and Curtis Courts, were *** illicit drug users and dealers. I suppose we have two sorts of things, their reputation evidence, first of all, as I said, for truth and veracity or perhaps lawfulness, if that's a proper consideration in this case, and perhaps instead of reputation, actual bad acts or other crimes evidence, using drugs or selling or handling drugs. If it were the latter, the state could have properly made a motion in limine to keep out the evidence of other crimes, insofar as dealing with drugs. Using drugs, and if there was an allegation of use of the drugs about the time of the robbery; that is, to-wit, 5:20 on the night in question, that may be another matter, that would probably be admissible, but all that is in the affidavit is that the Courts are known by the community to be illicit drug users and dealers, so it doesn't seem like there's any particular allegation that there's evidence

they used anything that day, hence were unable to perceive and remember. So it seems to me in considering the allegation in its light most favorable to the defendant, that the allegation as drawn really could not give rise to any admissible evidence against these persons."

The trial court was mistaken and improperly relied on erroneous legal principles when it held that only evidence of the Courtses' use of drugs on the date of the robbery affecting their perception and memory was admissible. The trial court erred when it predicated denial of the post-trial motion on this erroneous legal principle.

The Courtses' use of drugs on the date of the robbery and the drugs' effect on their perception and memory certainly would have been an appropriate subject of inquiry by defense counsel, as the trial court indicated. But defense counsel would not have been restricted solely to this inquiry, as the trial court erroneously ruled. Chronic drug usage and addiction and the drug's adverse effects on the addict's perception and memory, whether or not the addict is then under the influence or has recently used drugs, are also appropriate areas of inquiry of a witness who is a drug addict. Additional and certainly equally important areas of inquiry of the drug addict witness are the drug addict's veracity, the drug addict's integrity, the drug addict's chronic inclination to prevaricate and deceive and the drug addict's credibility.

In *People v. Strother* (1972), 53 Ill. 2d 95, 99, 290 N.E.2d 201, the trial court denied the defendant's request to examine the witness' arm for needle marks to establish the witness' addiction to narcotic drugs. In reversing and remanding for a new trial, the supreme court stated:

" '[T]he question of whether a witness is a narcotics addict is an important consideration in passing upon the credibility of a witness for *** *the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars.* (*People v. Boyd*, 17 Ill. 2d 321, 326.) The presence of any scars evidencing a recent use of narcotics would not only affect the credibility of the witness insofar as the recent use of narcotics was concerned, but also might reasonably cast serious doubt upon the truth of the balance of his testimony.' " (Emphasis added.)

In *People v. Di Maso* (1981), 100 Ill. App. 3d 338, 426 N.E.2d 972, the defendants were convicted of aggravated battery upon Harry Verner. The defendants presented an alibi and the court pointed out, as in the case at bar, that "the primary issue was one of identifica-

tion." The trial court restricted cross-examination and presentation of evidence of Verner's drug usage. This court reversed and stated:

"Our courts have repeatedly held that evidence of habitual drug use is a significant factor in evaluating witness credibility not only because *it evinces a generally dishonest character*, but also because it is particularly probative of the witness' abilities to perceive and recall accurately. [Citations.] Especially where, as here, the issue is one of identification, defendant is entitled to cross-examine and to present independent evidence of matters regarding the witness' 'powers of discernment and his capacity to form a correct judgment ***.' [Citation.] Our supreme court applied this rationale when it held that defendant is entitled to proceed beyond a witness' denial of drug addiction ***. ***

We do not believe that the proffered evidence of Verner's habitual drug use is so remote from the relevant events about which he testified so as to be rendered irrelevant for impeachment purposes. Verner was allegedly treated for addiction approximately two months prior to the battery." (Emphasis added.) 100 Ill. App. 3d at 342.

The drug addict's perception and memory was not an issue in *People v. Lurry* (1979), 77 Ill. App. 3d 108, 395 N.E.2d 1234, rather, the addict's credibility was the issue. The addict testified that the defendant shot him. The addict and the defendant were acquaintances and thus, unlike in the case at bar, the defendant's identification in *Lurry* was not an issue. The court in *Lurry* restricted cross-examination of the addict to his current drug usage.

In *Lurry*, as in the case at bar, the defendant denied commission of the offense and presented an alibi. Lurry was convicted. In reversing, the court stated that, "[T]he question as to whether a witness is a narcotics addict is an important consideration in passing upon the credibility of a witness. (*People v. Lewis* (1962), 25 Ill. 2d 396, 185 N.E.2d 168.) Our supreme court in *Lewis* made the observation that habitual users of narcotics become notorious liars," and that "the question is whether the witness is an addict and hence his credibility is suspect." 77 Ill. App. at 112.

It is well established that a defendant is not limited to proof that the victim-witness was under the influence of drugs at the time of the offense. It is also clear that the defendant is not restricted to inquiring on the effect the victim's current drug usage had on the victim's perception at the time of the offense and the victim's memory thereafter. The trial judge was mistaken in holding otherwise and in predi-

cating his denial of the motion for a new trial on this erroneous premise. The Courtses' drug addiction (and dealings) would have been admissible at the defendant's initial trial and at a retrial. The trial court erred when it contrarily ruled and on that ground denied the motion for a new trial.

Other newly discovered evidence presented to the trial court on which the defendant relied for a new trial was the statements of Roderick Parker—that he was present at 6819 South Dorchester when Waldroud was arrested and when Sandra and Curtis Courts told the arresting officers that they had been robbed at 6803 South Dorchester and not at 6810 South Dorchester, the address at which they testified the robbery occurred. Waldroud's attorney stated to the trial court in support of the new trial motion, "It's our contention they were steering the police away from the drug house because of that, giving the other address. *** [T]he policeman testified *** that they were not given a specific address as to where this occurrence happened, but a block on which it occurred ***." Waldroud's attorney further pointed out to the trial court that "the co-defendant's [P.C.'s] statement that where the robbery took place lists the address that's the same address as our witness tells us the Courts told the police, that's 6803 South Dorchester."

Sandra Courts testified that she and her husband were in the 6810 South Dorchester building to pick up her sister from Detroit, who was visiting in the building with a friend. The friend was not identified and the Courtses did not know in what apartment her sister was visiting and knocked on several doors to locate her. The record is silent on whether the Courtses located her sister or resumed their search for her.

It is also notable that there was newly discovered evidence that the Courtses, reputed drug users and dealers, were in the building, a drug house, to conduct a sale of drugs. In ruling on this newly discovered evidence, the trial court stated:

> "Insofar as the address of where the event occurred, that material does not seem to me to be the type that is of exclusive character that would change the result of the case, but *if it were absolutely certain that at 6803 rather than 6810, that may raise some questions about the integrity of Sandra Courts and Curtis Courts,* but I really don't think that insofar as the issues of [this] case, anything would be changed." (Emphasis added.)

The trial court overruled Waldroud's motion for a new trial on the grounds of newly discovered evidence. On Waldroud's sentencing

hearing the prosecutor conversely argued to the trial court that "the defendant Waldroud was in fact the main mover in this armed robbery." On P.C.'s earlier sentencing hearing, however, the prosecutor argued to the trial court that P.C. was "the leader in the robbery, the man with the gun," who took charge and supervised "the activities of the co-defendant Waldroud." The trial court sentenced Waldroud to 10 years' imprisonment.

An accused who is identified as a robber by a robbery victim shortly after the commission of the robbery and while in the area of the robbery scene, however innocent he may be, is in an untenable predicament in defending against the charge. The police reports and the victim's statements of the offense and offender to the police are prepared after the arrest and are therefore quite naturally prepared compatible with the victim's version of the robbery, the defendant's post-arrest description, and the defendant's commission of the offense. There are no prearrest police reports or recorded descriptions of the offender, or recorded prearrest statements of the victim from which defense counsel can cross-examine or challenge the victim's version of the commission of the offense or impeach the victim's description of the offender or refute the victim's identification of the defendant as the robber. In these circumstances an accused is precluded from asserting that he was elsewhere when the offense was committed. The integrity and accuracy of the trial fact-finding process in this situation are precarious to say the least. All legally admissible available facts and circumstances should be presented to the court as an aid in the correct and just resolution of the crucial issues and dilemmas before the court in the trial proceedings.

The Supreme Court pointed out in *United States v. Wade* (1967), 388 U.S. 218, 228, 18 L. Ed. 2d 1149, 1158, 87 S. Ct. 1926, 1933, that "identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. *** The identification of strangers is proverbially untrustworthy. The hazards of such are established by a formidable number of instances in the records of English and American trials." To paraphrase further Supreme Court language in *Wade*, mistaken identification by witnesses, "probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined." 318 U.S. at 229, 18 L. Ed. 2d at 1158, 87 S. Ct. at 1933.

Waldroud offered an explanation for his presence on the porch in

the area of the robbery scene. He was there drinking beer after his purchase of marijuana. It is apparent that the Courtses did not identify to the police officers the robbers among the group of persons on the porch, and the record before us does not reveal that the Courtses specifically pointed out P.C. or Waldroud on the porch to the officers as the robbers. When the police approached the porch, Waldroud fled into the building, as did the others who were on the porch. Waldroud's motive for fleeing was plausible, *i.e.*, to avoid being arrested with the marijuana in his possession. The officers pursued the fugitives into the building and brought them out as they were apprehended. The record does not disclose whether the physical description or wearing apparel of any of the persons on the porch who fled and were apprehended in the building were similar to Waldroud's. The persons apprehended in the building were released when the Courtses failed to identify them. It is reasonable to conclude from this record that the Courtses merely stated to the officers that the persons who had robbed them were among the persons who were on the porch, or at least they thought so.

P.C. was apprehended in the building while in possession of loot from the robbery. Waldroud was apprehended in the building, as were others. He had none of the robbery loot. Waldroud denied commission of the robbery and denied that he knew the codefendant, P.C. The record reflects that P.C. confessed his involvement in the robbery, but there is no indication in the record that he implicated Waldroud in the robbery or that he even knew Waldroud. Waldroud told the officers at the police station that he was with Boykin at the time the robbery was committed and he gave the officers Boykin's name, address and telephone number, all of which, significantly, were recorded in the police reports that were submitted to Waldroud's attorney pursuant to the discovery rules and which went unrebutted by the State at trial. Waldroud's attorney stated before trial that Boykin had advised him that the police had talked to him, and that Boykin had advised him that the police had talked to him, and that Boykin was going to be an alibi defense witness at trial. Boykin was an alibi defense witness at trial and no effort was made to impeach him by any prior statements he made to the police officers.

The trial court denied the defendant's motion for a new trial on the newly discovered evidence that the building was being abandoned, that there were no electric lights in the building at the robbery scene, that the Courtses were drug users and dealers and were involved in a drug transaction in the building and that they told the officers that the robbery occurred in another part of the apartment

building complex.

The majority resorts to Waldroud's court-appointed attorney's lack of diligence in affirming the trial court's denial of the motion for a new trial. The majority states, "[T]he evidence relating to the lighting conditions of the locus of the crime could have been discovered before trial by the same type of investigation made by defendant's counsel after trial. *** A motion for a new trial must be accompanied by defendant's affidavit showing his lack of prior knowledge of this evidence and his diligence in obtaining it." 163 Ill. App. 3d at 319-20.

First, Waldroud's attorney clearly established his diligence when he presented the post-trial motion to the trial court on January 20, 1984, which is set forth herein at pages 329 and 330 (163 Ill. App. 3d at 329-30) and need not be again repeated.

Second, unlike the majority here, the trial court did not rely on or find that Waldroud's attorney was guilty of a lack of diligence as a ground for denying the motion for a new trial.

Third, again conversely to the majority's holding, the trial court in effect found that the diligence of Waldroud's appointed attorney was established. The trial court stated, "[T]he newly discovered evidence, and I warrant it would have been very difficult for you to, under the circumstances, to have found this evidence before trial ***."

The trial court vacillated from reliance on the Courtses' trial testimony that the stair landing robbery scene was electrically lighted, on which it relied when it found the defendant guilty and accepted the prosecutor's post-trial converse argument in opposition to the defendant's motion for a new trial that the landing was naturally lighted. The trial court concluded that the post-trial affidavits and statements of Mrs. Catherine Carswell, Ms. Berdean Wingo, Mrs. Jeanette Jackson and Mr. Roderick Parker, who lived in the building and who it would appear were unbiased and impartial, established that the stair landing was not electrically lighted. The trial court stated, however, that such evidence, "even if brought forth, would not have conclusively affected the outcome, would not have changed the outcome of the case."

As stated, the accuracy of the Courtses' identification of the robber based on the lighting conditions in the stairwell and the Courtses' resultant ability to see the robber was the crucial issue in the case. Waldroud argues, with merit, that from the convoluted rationale the trial court employed in analyzing and weighing the trial evidence when the trial court found him guilty, from the trial court's flip-flop assessment of the trial evidence and similar illogical assessment of the newly discovered evidence, and from the trial court's improper reli-

ance on erroneous legal principles in denying the new trial motion, it becomes apparent that the trial court was simply determined to find him guilty and deny the new trial motion. In addition to the foregoing inappropriate bases for denying the new trial motion, the trial court also denied the motion on the further nebulous ground that the statements of Ms. Wingo, Ms. Jackson and Mr. Parker that the Courtses were drug users and dealers and were in the building on a drug transaction "did not give rise to any admissible evidence against these persons [the Courtses]." The trial court also held that the newly discovered evidence of the Courtses' statement that the robbery occurred at 6803 South Dorchester, which was contrary to the Courtses' trial testimony that the robbery occurred at 6810 South Dorchester, "would [not] change the result of the case." The trial court promptly thereafter conversely stated, however, that "if it were *absolutely certain* that it happened at 6803 rather than 6810, *that may raise some questions about the integrity of Sandra Courts and Curtis Courts.*" (Emphasis added.) Even so, the burden was not on Waldroud to establish to an *absolute certainty* where the robbery occurred. Moreover, Waldroud's newly discovered evidence that the robbery occurred at a location different than that at which the Courtses testified *did raise* questions about the Courtses' integrity.

Review of the authorities establishes that the trial court abused its discretion and erred in denying Waldroud's motion for a new trial and that it also erred when it relied on its stated reasons for so doing. In *People v. Hughes* (1973), 11 Ill. App. 3d 224, 296 N.E.2d 643, the defendant was convicted of burglary. On his motion for a new trial based on newly discovered evidence the defendant presented the testimony of his alleged accomplice that the defendant was passed out from alcoholic intoxication in the rear seat of the car, when, without the defendant's knowledge, the alleged accomplice and another burglarized the premises. The trial judge denied the new trial motion. The appellate court reversed, stating:

> "To award a new trial on the basis of newly discovered evidence, it must be of such conclusive character that it will probably change the result on re-trial, must be material to the issue and not merely cumulative, and must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. The burden is upon the applicant to rebut the presumption that the verdict is correct and to show that there has been no lack of diligence. Granting the motion is largely discretionary with the trial court except in case of manifest abuse. [Citations.]

These stringent rules are based on public policy which looks to the finality of trials and therefore requires that parties be held to diligence in preparing their cases for trial. The standards enumerated are not absolute but are guides to the discretion of the trial court. *Where the newly discovered evidence is not cumulative and the importance of it could not have been foreseen, and it strengthens the conviction of the court that justice has not been done, a new trial will be granted for further examination of the case.*" (Emphasis added.) 11 Ill. App. 3d at 228-29.

In *People v. Pirovolos* (1970), 126 Ill. App. 2d 361, 261 N.E.2d 701, at his bench trial for murder, the defendant testified that he acted in self-defense when he killed the deceased with his knife. The trial court found him guilty of voluntary manslaughter. In his motion for a new trial based on newly discovered evidence, the defendant asserted that since the trial his wife had found an additional witness, Durand, to the fight, whose version established that the defendant acted in self-defense. On the hearing of the motion, the testimony of the newly discovered witness, Durand, revealed that the defendant acted in self-defense. The trial judge denied the new trial motion. This court reversed and held that "[t]he additional testimony of Durand was corroborative of that given by defendant, and could have changed the result of the trial. [Citation.] Consequently, we believe that the interests of justice demand that we remand the cause for a new trial." 126 Ill. App. 2d at 364.

In *People v. Upshaw* (1965), 58 Ill. App. 2d 256, 207 N.E.2d 728, James Glasper was robbed in the presence of David Tolar. Glasper testified that he had known and had seen the robber several times previously and identified the defendant as the robber. The defendant denied the robbery and presented an alibi. He was found guilty. On his motion for a new trial, the defendant contended that David Tolar, a witness to the robbery, would testify that defendant was not the robber. The trial court refused to allow Tolar to be brought in as a witness and denied the motion for a new trial. This court reversed, stating, "[I]n the interest of justice the conviction must be reversed and the cause remanded. Under the circumstances, David Tolar should have been allowed to testify. Defendant denied having committed the robbery. James Glasper positively identified defendant as the assailant. The entire case therefore revolved around the identity of the assailant. *** The motion for the new trial should have been granted." 58 Ill. App. 2d at 260-61.

In the case at bar the newly discovered evidence was not cumulative and the importance of it could not have been foreseen. In the

case at bar the newly discovered evidence strengthens the conviction that justice has not been done and a new trial should have been granted for further examination of the case. (*People v. Hughes* (1973), 11 Ill. App. 3d 224, 228-29, 296 N.E.2d 643.) The newly discovered evidence could have changed the result of the trial and the interest of justice demands a new trial. (*People v. Pirovolos* (1970), 126 Ill. App. 2d 361, 364, 261 N.E.2d 701.) The Courtses identified the defendant as one of their assailants. The defendant denied committing the robbery. The entire case revolved around the identity of the assailant, and his motion for a new trial on newly discovered evidence should have been granted. (*People v. Upshaw* (1965), 58 Ill. App. 2d 256, 207 N.E.2d 728.) The trial court abused its discretion in denying the motion and I do not agree with the majority's affirmance of the trial court on grounds different from those on which the trial court relied in denying the motion. The defendant's judgment of conviction should be reversed and the cause should be remanded for a new trial.

APPENDIX

"AFFIDAVIT

Now comes [C]ATHERINE CARSWELL, being first and duly sworn upon oath, deposes and states that:

1. I [C]ATHERINE CARSWELL am a resident of the City of Chicago, State of Illinois and have been since 1932.

2. That from March 7, 1982 to March 8, 1983, Affiant lived in the apartment complex then owned and maintained by Great American Realtors located at 6800 S. Dorchester.

3. That Affiant's address, while living at said complex, was 6806 S. Dorchester.

4. That after Affiant moved out of her apartment at 6806 S. Dorchester, she frequently visited relatives and/or associates still living in said apartment complex, her last visit prior to July 21, 1983 being July 14, 1983.

5. That throughout the course of Affiant's stay at said apartment complex, the hallway and landing lights were always out, and because of the continued reoccurrence of broken lights and stolen fuses, it was common for the lights in the hallways inside said apartment complex to remain out for months.

6. On Affiant's visit to said apartment complex on July 14, 1983, the entire complex from 6800 to 6820 Dorchester had been condemned, was scheduled for renovation and all tenants had been instructed to move.

344

7. That on July 14, 1983, Affiant visited a friend in 6810 South Dorchester and at that time, there was [sic] no lights on stairwell landing one and two, in that section of the building or the landing near the entrance door to that building.

8. That to my knowledge, no repairs had been made to improve the lighting conditions in the building hallways from July 14, 1983 to July 21, 1983.

Further Affiant sayeth not.

Catherine Carswell (signature)
KATHERINE [sic] CARSWELL

SUBSCRIBED AND SWORN to
before me this 10th day of
January, 1984."


STATE OF ILLINOIS )
                ) SS
COUNTY OF COOK )

"AFFIDAVIT

Kevin Patterson, being duly sworn under oath, deposes and states:

1. That he is a resident of the State of Illinois and has been since January 16, 1953.

2. That he was retained by Keith Davis, Attorney for Alonzo Waldroud, to investigate newly found evidence relating to an alleged armed robbery which took place on July 21, 1983, in which Alonzo Waldroud was arrested.

3. That during the course of Affiant's investigation, he had visited the apartment complex where the alleged robbery occurred and had occasion to talk to people who lived and/or frequented the apartment complex which extends from 6800 to 6820 South Dorchester.

4. That on January 5th, 6th and 8th, 1984, Affiant visited the apartment complex at 6810 South Dorchester where an armed robbery allegedly occurred which involved Alonzo Waldroud in July, 1983.

5. That on January 5th, 1984, there were lights on all four landings and on January 6th and 8th, 1984, there were lights on two landings, and the windows were old and dark colored and did not allow light through.

6. That Affiant turned out the lights on three floors (1st, 2nd and 3d floors) and nothing could be seen clearly without artificial lighting.

7. That on January 9, 1984, Affiant spoke with Alonzo Waldroud at the Cook County Jail and Affiant was told by Defendant, Waldroud, that he knew nothing about the lighting conditions of the building at 6810 South Dorchester on July 31, 1983, but that a friend, Ms. Suzette Stewart, had recently mentioned the issue to him.

8. That on January 9, 1984, at approximately 8:00 p.m. Affiant spoke to Ms. Suzette Stewart at her home. Ms. Stewart assisted in the investigation.

10. That on January 10, 1984, Affiant interviewed Ms. [C]atherine Carswell at her home in Argo, Illinois. Ms. Carswell informed Affiant that she had visited a friend on or about July 14, 1983, who lived at 6810 South Dorchester and that at that time, the building had been condemned and all tenants had been instructed to move. Affiant was also told that on that date no lights were in the stairwell at 6810 South Dorchester then and it was common for the stairwell to be without artificial light (see Affidavit signed by Ms. Carswell on January 13, 1984.)

11. On January 13, 1984, Affiant interviewed Ms. Berdean Wingo and Ms. Jeanette Jackson. Both Ms. Wingo and Ms. Jackson stated that they frequented the building at 6810 South Dorchester prior to moving out of the apartment complex in July, 1983, and that they needed a flashlight to enter and/or leave the building after dark, and that during the daylight hours, it was very dark in the hallway. Ms. Jackson also told Affiant that she knew of Curtis and Sandra selling drugs.

12. That on January 16, 1984, Affiant interviewed Orlando Boykin at his home. Mr. Boykin conveyed to Affiant that he frequented the building at 6810 South Dorchester and that the stairwell was always without lights and that he was in the building several days prior to the alleged robbery of July 21, 1983, and that at the time of his visit, there were no lights in the stairwell on any floor. Mr. Boykin stated that he did not tell Keith Davis this fact when Mr. Davis interviewed him prior to trial.

13. That on January 17, 1984, Affiant interviewed Mr. Roderick Parker at his home. At this time, Mr. Parker conveyed to Affiant that he lived in the apartment complex on the date of the robbery of Mr. and Mrs. Courts, and that he can/will attest to there being *no* artificial lighting in the apartment complex hallway at 6810 South Dorchester. Mr. Parker further stated that he knew of Mr. and Mrs. [Courts], and that they were known by the community to be drug addicts and that at the time they were robbed, they were leaving a known dope house and at that time, there were no lights in the stairwell/landing

at 6810 South Dorchester on the date in question. Mr. Parker also stated that he was present at 6819 S. Dorchester when Alonzo Waldroud was arrested, and that he heard Mr. and Mrs. [Courts] tell the arresting officers that they had been robbed at 6803 S. Dorchester.

14. That during the course of this investigation, Affiant was given forty-five ($45.00) dollars for traveling expenses.

15. Further Affiant sayeth not.

Kevin Patterson (signature)<br>
KEVIN PATTERSON

SUBSCRIBED AND SWORN to
before me this 19th day of
January, 1984.

_____(Signature)
NOTARY PUBLIC"